2023 IL App (1st) 210263

No. 1-21-0263

Opinion filed March 6, 2023.

First Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 89 CR 11750 |
| DEDRICK COLEMAN, | ) ) ) | The Honorable Angela M. Petrone, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE LAVIN delivered the judgment of the court, with opinion.
Justices Pucinski and Coghlan concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial, defendant Dedrick Coleman was found guilty of the 1989 first degree murders of Lance Hale and Avis Welch, armed robbery, and home invasion. While initially sentenced to death for the murders, that sentence was later commuted to natural life imprisonment by the Illinois governor. Defendant was also sentenced to a total term of 90 years' imprisonment for the home invasion and armed robbery convictions. Defendant now appeals from the denial of leave to file his second successive petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)), contending his trial counsel was

constitutionally ineffective for failing to present an allegedly exculpatory witness. Defendant also asserts the State used perjured testimony. We affirm.

¶ 2                                                     I. BACKGROUND

¶ 3      We recite only those facts relevant to the issues on appeal, as the details of defendant's case have been set forth at length in previous appeals. See, *e.g.*, *People v. Coleman*, 158 Ill. 2d 319 (1994). Trial evidence established that, in the early morning hours on April 26, 1989, defendant went to a Southside drug house, where he shot both Hale and Welch. Later that morning, defendant relayed to his cousin the specific events:

> "Defendant went up to the window of the drug house and asked for $8 worth of cocaine. When the man behind the window [(Hale)] turned his back, defendant shot him through the window. *** Defendant then climbed into the drug house through the window and went to the front room where he found the female victim [(Welch)]. This woman begged for her life but defendant ordered her to get down on the floor. Defendant then shot her in the head. Defendant took $400 from the male victim, as well as three rings and a gold chain from the drug house." *Id.* at 327-28.

Defendant showed these items to his cousin. *Id.* at 328.

¶ 4      Defendant relayed some version of the above-stated events to three other people, thereby confessing. Furthermore, the upstairs resident of the drug house, Aldene Lockett, tentatively identified defendant as being of the same height, complexion, and physical build of the person.

¶ 5      In addition, five days after these murders, on May 1, 1989, defendant shot and killed Alex McCullough, his employer in an illegal drug operation. McCullough also happened to operate the drug house where defendant had murdered Hale and Welch. Defendant admitted to killing McCullough, but the State ultimately nol-prossed those charges, yet presented evidence as

to McCullough at the double-murder trial involving Hale and Welch. Several trial witnesses, for example, identified defendant's gun as the same used in the McCullough murder. Defendant also displayed that gun just prior to the double drug house murders. Moreover, evidence showed the bullet that killed Hale had the same characteristics as the bullet that killed McCullough, which it was established, came from defendant's gun.

¶ 6    Relevant to this appeal, all this evidence corresponded with defendant's pretrial confession about the double murder to his Cook County jail cellmate Herbert Arch, a repeat criminal and one of the three individuals referenced immediately above who testified at defendant's trial. See *supra* ¶ 5. Defendant told Arch that he killed his boss McCullough because McCullough owed him money. He also told Arch that he shot two people in the head on the Southside at a drug house and the gun used to kill McCullough already had two to three murders on it. Many of the details defendant told Arch reflected those that defendant told his cousin. Ultimately, the inmate Arch was released from jail after a court found no probable cause in his drug possession case, and shortly thereafter, Arch told an Assistant State's Attorney what he had learned from defendant. At trial, the parties noted that Arch had previously testified against another fellow jail inmate, Emanual (Manny) Vazquez, involved in a gang-related murder, and Vazquez was convicted. In exchange for his testimony against Vazquez, a year was knocked off Arch's sentence. However, as to defendant's case, Arch specifically testified that he did not receive anything in exchange.

¶ 7    After the State rested, the defense presented its case. Defendant's theory was that someone else had committed the murders at the drug house and that it was McCullough who was the aggressor in their relationship. Among other witnesses, defendant called Vazquez in an effort to impugn Arch's reliability and truthfulness. Vazquez testified that he was serving a 40-year

prison sentence for first degree murder following his 1985 conviction and that he also had met Arch in jail while awaiting trial. Vazquez testified that Arch basically urged him to do a sketch and write some details about the murder he was accused of, and Vazquez believed Arch would help him by testifying that Vazquez was *not* the shooter. Instead, Arch turned the papers over to the State's Attorney's office and testified against Vazquez at his murder trial.

¶ 8 Notwithstanding this evidence offered to paint Arch as an unreliable witness, as set forth, the jury ultimately found defendant guilty, and the court sentenced him accordingly. Defendant filed several *pro se* posttrial motions alleging ineffective assistance of counsel and prosecutorial misconduct. In those *pro se* motions, however, defendant neglected to raise the factual bases underlying his present ineffective assistance and prosecutorial misconduct claims, as delineated further below.

¶ 9 Defendant's convictions were subsequently affirmed on direct appeal by the Illinois Supreme Court, even in the face of 14 claims of error, including for ineffective assistance of trial counsel. See *Coleman*, 158 Ill. 2d 319; *Coleman v. Illinois*, 513 U.S. 881 (1994) (denying *certiorari*); see also *United States ex rel. Coleman v. McAdory*, No. 03 C 7318, 2004 WL 783173 (N.D. Ill. Jan. 12, 2004) (denying defendant's petition for writ of *habeas corpus*). In 1995, defendant filed an initial postconviction petition, which he later amended, alleging that he was denied a fair trial, due process, and effective assistance of trial counsel, and that the State used perjured testimony.[1] While this petition proceeded to a third-stage evidentiary hearing, it was

---

[1]Specifically, defendant attached an affidavit from Lockett (the neighbor who had tentatively identified him and testified at his murder trial). In it, Lockett stated that the police pressured her to identify defendant, the State promised to relocate her in exchange for her testimony, and defense counsel never contacted her. Defendant appealed the circuit court's dismissal of this petition, and the supreme court reversed and remanded the cause for an evidentiary hearing. See *Coleman*, 158 Ill. 2d 319, *cert. denied*, 513 U.S. 881. The evidentiary hearing was held on November 15, 1999, and concluded on February 17, 2000. The circuit court denied the postconviction petition after finding Lockett did not testify credibly at the evidentiary hearing.

ultimately denied, and the supreme court affirmed that denial. See *Coleman*, 158 Ill. 2d 319, *cert. denied*, 513 U.S. 881; *People v. Coleman*, 206 Ill. 2d 261 (2002), *cert. denied*, 538 U.S. 1017 (2003). Defendant's ensuing collateral challenges, including his first successive postconviction petition wherein he asserted ineffective assistance of trial counsel for failure to present an exculpatory witness, were also unsuccessful. See *Coleman*, 206 Ill. 2d 261; *Coleman*, 2004 WL 783173 (denying *habeas corpus* relief); *People v. Coleman*, No. 1-06-3193 (2008) (unpublished order under Illinois Supreme Court Rule 23).

¶ 10    Defendant then filed the instant *pro se* second successive postconviction petition on November 19, 2018, arguing he had established both cause and prejudice for the petition to be granted. Private counsel subsequently filed an appearance on defendant's behalf and apparently rested on the *pro se* petition. The petition itself is 224 pages, but together with the exhibits, it's 467 pages. In relevant part, defendant alleged that another jail inmate, Anthony Williams, would attest that Arch's trial testimony against defendant was fabricated. As set forth, Arch was one of the four witnesses to whom defendant confessed; defendant told him about the double murders in the drug house when they were in jail together pretrial.

¶ 11    Specifically, in his successive petition, defendant once again alleged that his trial counsel was constitutionally ineffective for failing to present an exculpatory witness—this time, Williams. Defendant attached an affidavit from Williams, who noted that he was the "North Side Rapist" and was "all over the news in 1987." Williams averred that he had met a "Vice lord named Fox," also known as Herbert Arch, in the jail bullpen in 1989. While there awaiting court, Arch told Williams that a way to "get around" cases was to "find a goofy (inmate) with a murder case, try to get cool with him," and essentially have the inmate divulge details about his crime. Arch would add his own "spin or twist" to this information and relay it to the State's Attorney's

office in exchange for help and reduced time. Arch told Williams that he had done this before with a Spanish Cobra named Gordo (apparently, the above-referenced Emanuel Vasquez), and the State dropped Arch's previous rape case down a notch after he testified against Vasquez.

¶ 12    Per the affidavit, given concern for his safety following his testimony, Arch reached out to the State's Attorney's office when he arrived in jail. Prosecutors then met with him and offered to help Arch if he in turn helped them solve a murder investigation. Specifically, the State's Attorney officers said that if Arch obtained good information, they would release him from jail, and he would be bound to testify against the inmate at trial. Four days later, Arch was placed in a cell with defendant for about a week (they were both in the segregation unit at some point). Defendant would not "spill the beans" on the murders. Ultimately, however, Arch began running errands for defendant and made phone calls for him; one was to defendant's girlfriend, who gave Arch "crucial information" about the murders. The girlfriend stated that although defendant murdered McCullough in self-defense, defendant was with her having sex all night when the other murders were committed. Arch then took advantage of the girlfriend to obtain more information, which he put "all together," along with some details from defendant, before contacting the State's Attorney and signing a statement "against the dude." Arch reported he was expecting to be released and would then have sex with the "dude's" girlfriend and spend his money. Williams never saw Arch again after Arch conveyed this information.

¶ 13    Several months later, while in the same cell block, Williams met defendant (Shorty-D), whom he found to be "a good brother, kind hearted, reasonable," and the only man in whom Williams confided about his own charged offenses, and defendant did not "judge" Williams. Williams then wrote, "As I recall it, he [defendant] told me about a double murder case that he had on some drug dealers," but that "he didn't do it." Defendant claimed the information the

- 6 -

State had on him was false and that some "goofy-chump that was his cellie in the hole in div. 5" would testify that defendant had confessed to him about the double murders. Williams realized this was Arch and told defendant about their conversation, including that, according to Arch, the State's Attorney "didn't care if he was lying or not, they wanted to get Shorty D that bad." Defendant then revealed the written statement by Arch, which corresponded with what Arch had told Williams before in 1989. Williams gave his name and inmate number to defendant to give to his lawyer before trial.

¶ 14    The next day, defendant, along with Williams, called his lawyer to convey the information set forth above, namely that Arch's story was fake and Arch had scammed the State before. Soon thereafter, defendant's lawyer interviewed Williams for about an hour and a half about the aforementioned information, writing everything on a yellow note pad. The lawyer ordered Williams to tell him "everything" he knew about defendant. The lawyer, who was "straight forward and inquisitive," also asked personal questions of Williams, like about his school, family, gang membership, and rape cases. Williams averred that he signed 13 pages of notes taken by the defense lawyer reflecting his statement. Following this, Williams never heard from the lawyer again, nor did he testify at defendant's trial. In fact, defendant and Williams did not see each other again until fall 2016, when they ran into each other in the prison yard, according to both Williams's affidavit and defendant's own attached affidavit.

¶ 15    Defendant's affidavit reflected many details from Williams's affidavit as to the interactions between Arch and Williams.[2] Defendant noted that he was unaware of the meeting between Williams and his lawyer. Yet, defendant had asked his lawyer multiple times about Williams right before his trial, but the lawyer had already obtained Vasquez as an impeachment

_____

[2]On appeal, defendant does not focus on his own affidavit, so we also do not.

witness. His lawyer expressed that Williams was too "risky" of a witness. Defendant also averred that his postconviction attorney and their investigator had tried to locate Williams "in the system" in 1995 but were unsuccessful because they only knew Williams's gang name, as defendant had lost Williams's information.

¶ 16    In addition to alleging ineffective assistance of trial counsel on the basis of Williams's affidavit, defendant also alleged that the State committed prosecutorial misconduct by using the perjured testimony of Arch. Specifically, defendant asserted that "Herbert 'The Fox' Arch, maliciously schemed with the Cook County State Attorney's Office to fabricate, concoct a customary story in order to commit an act of perjury by lying on behalf of the Prosecution" at trial. And, further, regardless of whether the State knew of this fabrication, he alleged that Arch was still its agent. Defendant also asserted that Williams should have been called as a defense witness, and this "played a pivotal part in his conviction." The circuit court denied defendant leave to file his second successive postconviction petition after finding he had failed, despite his express efforts, to establish cause and prejudice. Defendant appealed.

¶ 17                                    II. ANALYSIS

¶ 18    The Act provides a procedural mechanism through which a criminal defendant can assert that his federal or state constitutional rights were substantially violated in his original trial or sentencing hearing. 725 ILCS 5/122-1(a) (West 2018); *People v. Davis*, 2014 IL 115595, ¶ 13. The Act contemplates the filing of only one petition without leave of court, and any claim not presented in an original or amended petition is waived. *Davis*, 2014 IL 115595, ¶¶ 13-14. A defendant faces immense procedural default hurdles, when bringing a successive petition, that are lowered in very limited circumstances. *People v. Dorsey*, 2021 IL 123010, ¶ 32. As such, successive petitions are highly disfavored. *People v. Bailey*, 2017 IL 121450, ¶ 39. Yet, leave of

- 8 -

court for initiating a successive petition is granted when a defendant shows cause for his failure to bring the claim in his initial postconviction petition and prejudice resulting from that failure. 725 ILCS 5/122-1(f) (West 2018); *People v. Evans*, 2013 IL 113471, ¶ 10.

¶ 19     To demonstrate cause, a petitioner "must show some objective factor external to the defense that impeded his ability to raise the claim in his initial postconviction proceeding." *People v. Jackson*, 2021 IL 124818, ¶ 30; *People v. Pitsonbarger*, 205 Ill. 2d 444, 460 (2002). For example, a showing that the factual or legal basis for a claim was not reasonably available to postconviction counsel will constitute cause. *People v. Blalock*, 2022 IL 126682, ¶ 39. To demonstrate prejudice, the defendant must show that the claimed error so infected his trial that the resulting conviction violated due process. *Jackson*, 2021 IL 124818, ¶ 30. Both elements must be satisfied, and we review the denial of leave to file a successive petition *de novo*. *People v. Robinson*, 2020 IL 123849, ¶ 39; *People v. Carrion*, 2020 IL App (1st) 171001, ¶ 25. Leave to file a successive petition should be denied when it is clear from a review of the successive petition and documentation that the petitioner's claims fail as a matter of law or when the petition, with supporting documentation, is insufficient to warrant further proceedings. *Bailey*, 2017 IL 121450, ¶ 21.

¶ 20     The State initially argues that defendant forfeited his claims by failing to raise them before, such as on direct appeal and in his initial postconviction petition. We agree.

¶ 21     Prior to his trial, defendant admittedly knew about Williams and his purportedly exculpatory statement, as well as the allegedly perjured testimony by Arch, but did not assert these facts established ineffective assistance or prosecutorial misconduct due to perjury. More significantly, defendant had the capability of obtaining evidence to support his claims, as we detail below (see *infra*, ¶¶ 23-25). Yet, defendant filed two *pro se* posttrial motions alleging

ineffective assistance of counsel and prosecutorial misconduct but neglected to raise the factual and evidentiary bases underlying his present ineffective assistance and prosecutorial misconduct claims. Incidentally, defendant also raised these same legal claims, absent the present factual bases, on direct appeal and in his first postconviction petition. The law is clear, however, that issues which were already decided on direct appeal are barred by *res judicata*; any issues which could have been raised on direct appeal or in the first postconviction petition are defaulted. 725 ILCS 5/122-3 (West 2018); *People v. Tenner*, 206 Ill. 2d 381, 392 (2002). What is more, a determination of *res judicata* and forfeiture renders an otherwise meritorious claim frivolous and legally meritless, which is insufficient to warrant further proceedings on a successive petition. See *Bailey*, 2017 IL 121450, ¶ 22; *People v. Blair*, 215 Ill. 2d 427, 445-47 (2005); see also *People v. Guerrero*, 2012 IL 112020, ¶¶ 16-17 (noting, these principles also defeat the cause prong).

¶ 22　Even forfeiture aside, defendant's contentions as to cause and prejudice fail. As to cause, defendant argues that he was unable to obtain Williams's affidavit until 2016.[3] He maintains that they lost contact after their initial 1989 jail meeting, and defendant's postconviction attorney could not locate Williams, knowing only his gang nickname (Big C), when defendant filed his first postconviction petition in 1995. Defendant asserts he therefore was incapable of supporting his ineffective assistance claim, as required. See 725 ILCS 5/122-2 (West 1994); 725 ILCS 5/122-2 (West 2018).

¶ 23　For the reasons to follow, defendant has not pointed to an objective factor that impeded his ability to raise the claim in the first proceeding. See *People v. Smith*, 341 Ill. App. 3d 530, 540 (2003). First, as set forth, the facts provided by Williams were known to both defendant and

_____

[3]In his petition, he writes that he obtained the affidavit in January 2017.

his attorney, even prior to defendant's trial. As such, that information does not constitute newly discovered evidence. See *id.*; see also *Jackson*, 2021 IL 124818, ¶¶ 31, 42. Defendant could have alleged these facts in support of his constitutional claims in his initial petition and attached his own affidavit and/or one from his postconviction attorney, explaining why Williams could not be located.[4] Indeed, a "petition shall have attached thereto affidavits, records, or other evidence supporting its allegations *or shall state why the same are not attached*." (Emphasis added.) 725 ILCS 5/122-2 (West 1994); 725 ILCS 5/122-2 (West 2018); see also *People v. Collins*, 202 Ill. 2d 59, 67 (2002) (same). "[W]hile a *pro se* petition is not expected to set forth a complete and detailed factual recitation, it must set forth some facts which can be corroborated and are objective in nature or contain some explanation as to why those facts are absent." *People v. Delton*, 227 Ill. 2d 247, 254-55 (2008); see also *People v. Resendiz*, 2020 IL App (1st) 180821, ¶ 23 (same). At the first stage of postconviction proceedings, defendant was merely required to present the "gist of a constitutional claim," which he did not do as to Williams. See *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). Thus, the unavailability of Williams's affidavit, at best, deprived defendant of helpful support for his constitutional claim, which is insufficient to establish cause. See *Dorsey*, 2021 IL 123010, ¶ 74.

---

[4]Defendant argues that submitting an affidavit as to what Williams would have averred, as the State suggests, would not have been permissible in 1995, when he filed his initial postconviction petition, where hearsay statements were prohibited. See *Robinson*, 2020 IL 123849, ¶ 78; *People v. Velasco*, 2018 IL App (1st) 161683, ¶¶ 114-19 (noting, as of 2013, hearsay rules no longer apply to postconviction petitions at the first and second stages). Notwithstanding this limitation, nothing precluded defendant from detailing his efforts to secure Williams's affidavit or explaining why it was not attached. That would have been sufficient under the Act. See 725 ILCS 5/122-2 (West 1994); 725 ILCS 5/122-2 (West 2018); see also *People v. Collins*, 202 Ill. 2d 59, 67 (2002); *cf. People v. Coleman*, 2012 IL App (4th) 110463, ¶¶ 52, 55 (summarily dismissing a postconviction claim premised on the defendant's statements as to what other witnesses would have testified to, where the defendant failed to explain why the affidavits from the witnesses were unavailable). Similarly, we reject defendant's contention that even during second stage proceedings, Williams would have been impossible to locate. That argument is too speculative, and as we explain, there are many other actions defendant and his attorney could have taken to locate Williams in order to fulfill a diligent search.

¶ 24    Second, in that same vein, defendant also could have done more to locate Williams in order to secure his affidavit. For example, defendant could have reached out to his trial lawyer for Williams's contact information. Per the affidavits, defendant had conveyed the information Williams gave him to defense counsel via telephone. This included Williams's name and inmate number, although defendant was apparently unaware of his attorney's subsequent interview with Williams. Defendant also had asked his lawyer multiple times about Williams right before trial. Yet, neither defendant's petition nor the aforementioned affidavits indicate that defendant sought Williams's contact information from his trial lawyer upon filing his initial petition.

¶ 25    Likewise, although Williams was the "North Side Rapist," who was "all over the news in 1987," and defendant learned of this when he met Williams, there is no indication that defendant sought to discover Williams's name and contact information through any newspaper or similar outlet. Defendant averred that by 1995, when he filed his first petition, he had forgotten this rather significant detail about Williams's criminal past (even though the two had extensive conversations about their reasons for being incarcerated per their affidavits). However, defendant could have discovered this information with any reasonable inquiry. Indeed, defendant knew Williams's gang nickname and the prison tier he had been on, so surely he could have obtained his legal name, his status as the North Side rapist, and his contact information through other means. In other words, defendant has not articulated why he could not have discovered the facts in support of his claim earlier through the exercise of due diligence, as is required to establish "cause" (and "prejudice," too). See *Jackson*, 2021 IL 124818, ¶ 31; *People v. Hemphill*, 2022 IL App (1st) 201112, ¶ 21. This was his burden, and he failed.

¶ 26    Moreover, as to prejudice for filing his successive petition, defendant argues that Williams's proffered testimony would have significantly undermined Arch's trial testimony that

defendant murdered two people (Hale and Welch) with the same gun used to kill McCullough. He maintains that Williams's account instead would have established that Arch committed perjury, and those combined matters—ineffective assistance of counsel and the knowing use of perjured testimony—so infected his trial that his conviction violated due process.

¶ 27    Even if defendant had raised this issue in his initial postconviction petition, it would not have succeeded. See *Smith*, 341 Ill. App. 3d at 540-41. As such, it certainly cannot succeed now. To prevail on an ineffective assistance of counsel claim, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance resulted in prejudice. *People v. Johnson*, 2021 IL 126291, ¶ 52. As to the deficiency prong, a defendant must overcome the strong presumption that the challenged action or inaction of counsel was the product of sound trial strategy and not of incompetence. *Coleman*, 183 Ill. 2d 366, 397 (1998). Decisions concerning which witnesses to call at trial and what evidence to present on defendant's behalf ultimately rest with trial counsel and have long been viewed as matters of trial strategy that are generally immune from ineffective assistance claims. *People v. West*, 187 Ill. 2d 418, 432 (1999).

¶ 28    Here, the affidavit in question detailed that defendant and Williams contacted defendant's trial counsel, informing counsel of Williams's claim that Arch's story was fake and that he had scammed the State before. Shortly thereafter, defense counsel interviewed Williams for about an hour and half about this matter, questioning him extensively about defendant's case and Williams's own personal information. Yet, defense counsel apparently declined to call Williams as a witness at trial. When defendant inquired about Williams prior to trial, according to the affidavits, defense counsel reported he had already obtained an impeachment witness, and counsel found Williams *was too risky of a witness*. The record does not disclose why, but as set

forth Williams was a repeat rapist and also in prison himself. We would add that in response to defendant's posttrial claim of ineffective assistance, the trial court found defense counsel's "conduct in this case to be very professional" and that he represented defendant "in a real journeyman fashion in so far as [*sic*] this case was concerned, and he represented him very, very well." The record and affidavits, therefore, rebut defendant's contention that his defense counsel was deficient, the first prong of *Strickland*, and instead support the strong presumption that counsel declined to call Williams as a matter of sound trial strategy. See *Coleman*, 183 Ill. 2d at 397; see also *People v. Hotwagner*, 2015 IL App (5th) 130525, ¶ 48 (noting that it is strategically sound for counsel not to call a witness with testimony that is likely harmful or of questionable value).

¶ 29    What is more, to establish *Strickland* prejudice for an ineffectiveness claim (the second prong), a defendant must demonstrate that, but for defense counsel's deficient performance, the result of the proceeding would have been different. *Coleman*, 183 Ill. 2d at 397. Defendant cannot do so. Here, defense counsel called Vazquez (referred to as Gordo in the affidavit) as a witness to testify first-hand that Arch culled information from Vazquez while the two were incarcerated and then used that information to make a deal with the State for Arch's own benefit. Arch's testimony and his credibility as a witness were already severely attacked in that manner on both cross-examination and in defendant's case in chief. As such, Williams's proffered testimony would not have added much to the defense because it would have been cumulative in terms of impugning Arch's credibility. See *People v. Hayes*, 2011 IL App (1st) 100127, ¶ 42. The jury was already aware that Arch had a motive to testify for the State. Moreover, at best, Williams's uncorroborated testimony would have merely conflicted with the evidence offered against defendant but would not have been conclusively exonerating. This vitiates *Strickland*

prejudice for ineffectiveness and prejudice under the Act. See *id.*; see also *Jackson*, 2021 IL 124818, ¶ 31 (noting that "the evidence must be material rather than merely cumulative").

¶ 30 Regardless, as the direct appeal decision by our supreme court determined, the evidence against defendant—including the three other witnesses to whom he confessed and who testified at his trial, the physical evidence, the motive evidence, and the one eyewitness's observations— "was overwhelming." *Coleman*, 158 Ill. 2d at 334. As to this evidence, our supreme court noted:

> "Just prior to the crime, defendant told Truell that he was going to 'hit' McCullough's drug house on 43rd and Princeton. *** Moreover, People's exhibit number one, the gun that killed McCullough, matched the characteristics of the gun that killed Hale. Defendant admitted killing McCullough, and Truell testified that defendant had People's exhibit number one with him the night of the murders. Also, though not a positive identification, defendant was identified as being of the same height, complexion, and physical build as the person seen coming out of the drug house after shots were heard. Finally, defendant had the motive to kill Hale and Welch, McCullough's employees, to seek revenge on McCullough." *Id.*

The supreme court added that the other-crimes evidence as to McCullough was "was relevant and admissible to show defendant intended to kill McCullough and did not act in self-defense." *Id.* at 336-37. Thus, even absent Arch's testimony, defendant's conviction would still stand.[5] Arch's testimony was not critical to the State's case against defendant. See *Jackson*, 2021 IL 124818, ¶ 31. Defendant therefore has failed to establish prejudice under the Act.

¶ 31 For similar reasons, defendant's contention as to prosecutorial misconduct for perjury fares no better. It is well established that the State's knowing use of perjured testimony to obtain

[5]The State noted during oral arguments that there was plenty of other motive evidence for the murders, apart from Arch's testimony, and we agree.

- 15 -

a criminal conviction constitutes a violation of due process of law. *People v. Olinger*, 176 Ill. 2d 326, 345 (1997). A conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict. *Id.* These same principles apply where the State, although not soliciting the false testimony, allows it to go uncorrected when it appears. *Id.*

¶ 32    Defendant specifically contends that Williams's averments demonstrate that Arch committed perjury at trial in exchange for leniency in his own pending criminal case. Accordingly, defendant maintains the State failed to correct Arch's perjured testimony and knowingly used it to convict defendant.

¶ 33    Defendant's contentions suffer from a number of fatal flaws. First, the record refutes that Arch received leniency for his trial testimony against defendant. Not only did Arch testify under oath to the contrary, but the trial evidence demonstrates that Arch approached the State's Attorney's office *after* being released from jail. His release was premised not on a deal from the State in exchange for his trial testimony but, rather, on the fact that the court found no probable cause in Arch's own drug case. Defendant has not pointed to anything in his petition or the attached affidavits contradicting that Arch's release was premised on a legal determination made by the trial court. This directly undercuts defendant's contention that the State accorded Arch leniency or that it was done in exchange for his testimony. See *Blalock*, 2022 IL 126682, ¶ 49 (noting that the defendant's postconviction allegations were contradicted by his original trial testimony and so the defendant failed to make a showing of prejudice); *cf. Olinger*, 176 Ill. 2d at 347 (noting that the attorney representing a key witness at the defendant's murder trial provided an affidavit that unambiguously stated the witness obtained a multi-jurisdictional deal due to cooperation with Illinois authorities, contradicting the witness's testimony).

¶ 34    Second, Williams's affidavit does not demonstrate that the State was aware Arch's story was false; rather, it avers that Arch informed Williams of the scam. In fact, throughout the affidavit, Williams states that Arch was *scamming the State*. Williams's affidavit noted that the State's Attorney wished to place a wire on Arch, but Arch declined. While Williams also averred that the State's Attorney didn't care if Arch was lying or not, Williams never directly alleged that the State knew Arch was lying. *Cf. Olinger*, 176 Ill. 2d at 347-48 (noting that the attorney representing a key witness at the defendant's murder trial provided an affidavit that sufficiently indicated the prosecutor's office had knowledge of the witness's multi-jurisdictional deal not disclosed at trial). All this guts any claim as to prosecutorial misconduct.

> "In the absence of an allegation of the knowing use of false testimony, or at least some lack of diligence on the part of the State, there has been no involvement by the State in the false testimony to establish a violation of due process. [Citation.] Without such involvement, the action of a witness falsely testifying is an action of a private individual for which there is no remedy under the due process clause." *People v. Brown*, 169 Ill. 2d 94, 106 (1995).

See also *People v. Craig*, 334 Ill. App. 3d 426, 439 (2002) (noting that the burden of proving that the State knowingly used perjured testimony lies with the defendant).

¶ 35    Regardless, as the State noted during oral arguments, Williams's proffered testimony would create only a credibility contest between the defense and the State as to whether Arch committed perjury or the State knew of this perjury. We thus reject defendant's contention that "it would have proven" those points. More significantly, any failure by the State to correct Arch's testimony was harmless for the reasons already delineated above—Arch was not a critical witness, and the evidence against defendant was overwhelming. See *People v. Lucas*, 203 Ill. 2d

410, 424-27 (2002); *cf. Olinger*, 176 Ill. 2d at 349-50 (finding the witness who allegedly committed perjury was critical). Accordingly, there is no reasonable likelihood that the false testimony affected the judgment against defendant. *Olinger*, 176 Ill. 2d at 345.

¶ 36    Last, on appeal, defendant cites *People v. Smith*, 352 Ill. App. 3d 1095, 1101 (2004), to support his argument that Arch was an agent of the State. Defendant does so, however, without any factual development or citation to the record, which is insufficient under appellate rules of practice. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). In addition, *Smith* is distinguishable. There, the court found the State's criminalist and serological expert who ran blood tests connecting defendant to the crime could be considered an agent of the State for purposes of addressing the defendant's postconviction claim that she committed perjury. The facts of this case hardly present a similar scenario. As set forth, defendant's claim that Arch was an agent of the State is not well pled, where Williams reported that Arch was also scamming the State. See *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006); *People v. Dupree*, 2018 IL 122307, ¶ 31. Defendant also mentions in passing that his petition asserted prosecutorial misconduct for failing to disclose evidence of police misconduct. However, on appeal, he makes no argument about this matter. Points not argued are forfeited and cannot be raised in the reply brief. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). This court is not a depository into which an appellant may dump the burden of research and argument, as our docket is full. *People v. Hood*, 210 Ill. App. 3d 743, 746 (1991). We thus decline to entertain defendant's underdeveloped arguments further. See *id.*

¶ 37                              III. CONCLUSION

¶ 38    Defendant has failed to establish the requisite cause and prejudice for leave to file his postconviction petition. *People v. Peacock*, 2022 IL App (1st) 170308-B, ¶ 22. He has not demonstrated that the procedural bar against successive petitions should be relaxed. See

*Pitsonbarger*, 205 Ill. 2d at 458. We therefore affirm the circuit court's judgment denying defendant leave to file the petition.

¶ 39    Affirmed.

*People v. Coleman*, 2023 IL App (1st) 210263

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 89-CR-11750; the Hon. Angela M. Petrone, Judge, presiding. |
| **Attorneys for Appellant:** | Nate Nieman, of Rock Island, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Joseph Alexander, Daniel Piwowarczyk, and Gina Savini, Assistant State's Attorneys, of counsel), for the People. |