2025 IL App (1st) 230316-U

No. 1-23-0316

Order filed August 19, 2025

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) <br> ) | Appeal from the <br> Circuit Court of |
| Respondent-Appellee, | ) <br> ) | Cook County. |
| v. | ) <br> ) | No. 93 CR 12311 |
| DELANDIS ADAMS, | ) <br> ) | Honorable <br> Stanley J. Sacks, |
| Petitioner-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Affirmed in part, reversed in part, remanded with instructions. Petitioner alleged a colorable claim of actual innocence but did not show cause for failing to raise ineffective assistance claim in initial petition. Petition remanded for second-stage proceedings on actual innocence claim and reassignment to a new judge.

¶ 2    Petitioner Delandis Adams was convicted of kidnapping and murdering Darren Payton.

He now appeals the denial of leave to file a second successive postconviction petition, alleging

(1) actual innocence based on the affidavits of two newly discovered witnesses and (2)

ineffective assistance of trial counsel. We reverse the denial of leave to file the actual-innocence claim but find that the ineffective-assistance claim is procedurally defaulted. Out of an abundance of caution and at petitioner's request, we order the case reassigned to a new judge for second-stage proceedings.

¶ 3                                    BACKGROUND

¶ 4      We begin with a brief overview of the relevant trial evidence. A more detailed discussion of the facts can be found in our decision on direct appeal and our decision affirming the denial of petitioner's first postconviction petition. See *People v. Adams*, No. 1-95-4009 (1998) (unpublished order under Supreme Court Rule 23); *People v. Adams*, No. 1-06-1502 (2008) (unpublished order under Supreme Court Rule 23).

¶ 5                                    I. Trial

¶ 6      Petitioner was a high ranking member of the Conservative Vice Lords street gang and was arrested, along with five other members of the gang, in connection with the kidnapping and murder of Darren Payton, a fellow gang member who had allegedly violated the gang's rules. Payton was strangled to death. The primary source of evidence against petitioner was testimony from fellow gang members Ronald Glover and Devon Fountain. Glover agreed to plead guilty to aggravated kidnapping and testify against his codefendants, including petitioner, in exchange for the State dropping the murder charge and recommending a 10-year prison sentence. Fountain was never charged in connection with Payton's death.

¶ 7      Glover and Fountain both testified that on the evening of April 23 and early hours of April 24, 1993, they were at Fountain's house located on the 200 block of West 110th Place in Chicago, Illinois. Petitioner, along with codefendants Sherman Scullark, Darnell Luckett,

Manuel Mathews, Dwan Royal, and Marvel Scott, held Payton—who was bound at the hands and feet with extension cords and blindfolded—captive on the upper floor of the house. Fountain saw Payton bleeding from the mouth, and Glover heard "bumps" and screams from the upper floor where Payton was being held.

¶ 8       Glover testified that at one point, petitioner came downstairs and told Luckett and Mathews to "get ready." Scullark gave Glover a firearm and told him to go upstairs and watch Payton. Later, Glover heard vehicles pulling up in the front and people running up the front stairs. Scullark instructed Glover to go downstairs, where he heard Scullark instruct Scott and Royal to pull vehicles around the back. Petitioner and Royal removed speakers from the trunk of a white vehicle, brought the speakers inside, and went upstairs. Petitioner and the other codefendants carried Payton, now wrapped in a blanket (and still bound and blindfolded) and placed him in the trunk of the white vehicle. Petitioner then said, "[y]'all know what to do," and Scott left in the white vehicle. Petitioner returned to the house and told the remaining people, "Y'all ain't seen s***, y'all don't know s*** and y'all ain't heard s***."

¶ 9       Afterwards, when Glover was in lock-up with petitioner and other codefendants, petitioner threatened to kill anyone who testified against him. Petitioner also told them, "Don't worry about the police going into the house looking for evidence because he burned it down."

¶ 10      Fountain testified that he saw the white vehicle arrive in the back and park with its trunk against the stairs. Petitioner told Fountain to look out front for the police. A little while later, Fountain heard vehicles driving off. Later on April 24, 1993, Fountain saw a mop and bucket with blood in it on the second floor. Scullark poured the bucket in the grass from the enclosed back porch.

¶ 11    When Fountain was in Cook County Jail on an unrelated charge, petitioner sent him a letter offering to pay his bond. Fountain sent a reply letter informing petitioner that he needed $6,000 to get out. Fountain denied that he agreed to testify against his codefendants, including petitioner, after his bond was not paid.

¶ 12    Chicago police detective James Boylan interviewed petitioner, who told him that on April 23, 1993, petitioner attended a gang meeting on 113th Street in Chicago, then went to a party at a house located on the 200 block of West 110th Place. Petitioner left the party around 8 p.m. with his girlfriend, Monika Hotstream, and remained with her at her home with their child. Petitioner denied knowing of Payton's murder. He told Boylan that he controlled the Roseland area for the Conservative Vice Lords and would have been aware of the murder of any Vice Lords in the area. Boylan also interviewed Hotstream, who told him that she was out of town on the date of the murder.

¶ 13    Beer bottles recovered at the scene contained fingerprints positively matching the prints of Mathews, Royal, and Glover.

¶ 14    Felicia Myles, Stephen Kitt, and Patrick Sims all testified that they were at the house on 110th Place the evening of the incident. All three testified that they did not see anyone tied up in the back room and did not see petitioner at the house that evening. (We will elaborate on this testimony below, where relevant.)

¶ 15    Petitioner lived with his mother, Sherry Hale Adams, who testified that on the evening of the incident, she saw petitioner around 10:15 p.m. at home before she left for work. When she returned home at around 8:20 a.m., she saw petitioner sleeping.

¶ 16    The jury found petitioner guilty of first-degree murder and aggravated kidnapping, based on an accountability theory. The court sentenced petitioner to 80 years in prison for first-degree murder with a concurrent sentence of 30 years in prison for aggravated kidnapping.

¶ 17    Petitioner's convictions were affirmed on direct appeal. *People v. Adams*, No. 1-95-4009 (1998) (unpublished order under Supreme Court Rule 23).

¶ 18                              II. Post-Trial Proceedings

¶ 19                              A. First Postconviction Petition

¶ 20    In August 1997, petitioner filed a petition for relief from judgment, which the court recharacterized as a postconviction petition and summarily dismissed. Petitioner did not appeal.

¶ 21                              B. Second Postconviction Petition

¶ 22    On June 2, 1999, petitioner filed a postconviction petition, supported by affidavits from Fountain—recanting his testimony—and codefendant Luckett. Both affidavits averred that petitioner was not involved with Payton's murder. The petition was dismissed as frivolous and patently without merit. (The court treated the petition as an initial petition, not a successive.)

¶ 23    This court reversed and remanded for second-stage proceedings. *People v. Adams*, No. 1-99-2402 (2004) (unpublished order under Supreme Court Rule 23). Petitioner filed an amended petition. On the State's motion, the circuit court dismissed the petition, and this court affirmed. *People v. Adams*, 1-06-1502 (2008) (unpublished order under Supreme Court Rule 23).

¶ 24                              C. Third Postconviction Petition

¶ 25    On September 8, 2010, petitioner filed a motion for leave to file a successive postconviction petition, claiming, in part, actual innocence. Petitioner again attached affidavits from Luckett and Fountain. The circuit court denied the motion and this court affirmed, finding

that petitioner failed to state a colorable claim of actual innocence because the petition was not supported by newly discovered evidence. *People v. Adams*, 2015 IL App (1st) 121592-U.

¶ 26                    D. Postconviction Petition Under Review

¶ 27    On April 1, 2022, petitioner, through private counsel, filed the motion for leave to file the successive postconviction petition at issue here. The petition raised claims of actual innocence and ineffective assistance of trial counsel. Relevant to both claims, petitioner attached an affidavit from Lisa Evans. Evans's affidavit stated that petitioner had arrived at her home on the "early evening" of April 23, 1993, remained there all evening, and left at 9 a.m. the next day. She also stated that she told Luckett she was with petitioner on those dates. Evans swore that she would have been willing to testify if she had been contacted by the police, petitioner's attorney, or an investigator. Petitioner asserted that trial counsel was ineffective for failing to call Evans.

¶ 28    Petitioner's actual-innocence claim also relied on an attached affidavit from codefendant Mathews, who was also convicted of first-degree murder and aggravated kidnapping on an accountability theory. Mathews' affidavit, dated January 10, 2020, stated that he did not kill Payton, but he participated in Payton's kidnapping and witnessed Payton's murder. He stated that petitioner, whom he had known since they were children, "was not involved with or present during the kidnapping or murder of Darren Payton," and that petitioner was "not present at the house party on the night of April 23, 1993." In his affidavit, Mathews detailed that he lived in the house on 110th Place, and that on the evening of the murder he threw a house party, which about 30 people attended. He saw Glover and Fountain at the party, where they were drinking and smoking. Mathews told Glover to stop smoking crack and could tell that Glover was "wasted."

¶ 29    Mathews did not know Payton, but he saw Payton at the party with Luckett, Royal, and Paul Hawkins. The upstairs area of the house was under construction and off limits at the time of the party, but Luckett offered to pay to use the upstairs to "take care of some business." Mathews "witnessed Luckett and Royal strangle Payton to death" and watched them "carry Payton's body down the back stairs and put it in the trunk." While Mathews was in custody, Detective Michael McDermott told him that petitioner and codefendant Scullark were "going to go down for this crime," because they had just been acquitted on unrelated charges that he did not think they "should have beat." Detectives McDermott and Boylan tried to get Mathews to "point the finger" at Scullark and petitioner and commit perjury. Mathews was punched in the eye for not cooperating. Mathews did not come forward earlier because he thought he may "get out on appeal."

¶ 30    Petitioner also attached his own affidavit, which stated that he was with Evans at her home from 10 p.m. on April 23, 1993, until 9 a.m. on April 24. He informed his attorney that he was with Evans at the time but believed that his attorney did not contact Evans or ask her to testify. He was unable to locate Evans after his trial, so he could not obtain an affidavit from her to support his postconviction petition. In his amended and successive postconviction petitions, petitioner raised trial counsel's failure to call various witnesses but did not include the failure to call Evans, because he could not locate her and did not know whether she would be willing to testify. He located Evans around 2018, through a private investigator, and she agreed to testify.

¶ 31    The circuit court denied leave to file. The court entered a written finding and made comments orally on the record. The court explained that Evans's alibi evidence was not newly discovered, as "the fact that Petitioner was with Evans could have been discovered sooner," since

petitioner would have been aware of an alibi witness prior to trial and had been represented by able counsel throughout the litigation that followed his conviction. The court also noted that petitioner had raised an entirely different alibi at trial—namely, that he was at his mother's house, as his mother testified at trial.

¶ 32    As for the Mathews affidavit, the court doubted the evidence was newly discovered, as the evidence itself—that petitioner was not at the scene—would have been known to petitioner since trial, and Mathews was simply a different source of that evidence. The court was likewise skeptical of the claim that Mathews's fifth-amendment rights made him unavailable, as he had long given up any appeals or postconviction litigation while he spent his final years in prison.

¶ 33    The court also found the Mathews affidavit cumulative of the trial evidence. At most, Mathews and Evans simply testified that petitioner was not present at the scene, which other witnesses had testified to at trial.

¶ 34    Further, Mathews's affidavit was "directly contradicted by the countless other times Mathews has submitted his own sworn statements and the sworn testimony and statements of others that directly contradicts Mathews on the exact point at issue: who was present on the scene." For example, Mathews once filed an actual-innocence claim of his own, in which he denied any involvement with, or even presence at, the kidnapping and murder of Darren Payton, which obviously contradicted his current affidavit claiming to have participated in the kidnapping and witnessed the murder.

¶ 35    The court also noted the timing, as Mathews's affidavit came "immediately after he has been released from MSR on his sentence for the instant crimes, which comes as these witnesses are clearly altering stories as codefendants complete sentences and tailoring their affidavits in

obvious ways." The court summarized the state of the litigation regarding petitioner and his codefendants as follows:

"In sum, these witnesses will assert everyone was wrongfully alleged to have been on scene, then when one of those codefendants who was sworn to have never been present on scene serves his full sentence, all of the sudden the affiants' memories are refreshed and it turns out Mathews was actually on scene—despite Mathews' continuous assertions he was not on scene, presentation of what amounts to a false alibi at trial and presentation of perjured affidavits during postconviction proceedings given his current attestations, and continued assertion of actual innocence and alibi until he finally is released and suddenly recalls he was actually on scene with everyone else who has already gotten out but none of the codefendants still serving their sentences were there. The point being, Mathews' affidavit serves 'greater value as fiction than as credible evidence.' " [Citation.]

¶ 36   The court thus denied the leave to file the postconviction petition, finding that his claim of actual innocence failed and he failed the cause-and-prejudice test necessary to assert his claim of ineffective assistance of counsel. In its oral pronouncement, the court informed counsel to tell petitioner "to get it through his head he killed that guy. Let him do his time."

¶ 37                                ANALYSIS

¶ 38                        I. Actual-Innocence Claims

¶ 39   On appeal, petitioner first argues that the circuit court erred in denying his motion for leave to file a successive postconviction petition because the affidavits of Evans and Mathews sufficiently support his claim of actual innocence.

¶ 40　　The Post-Conviction Hearing Act (Act) generally allows for a petitioner to file only one postconviction petition without leave of the court. 725 ILCS 5/122-1 (West 2022). Claims not included in the original or amended petition are considered waived. 725 ILCS 5/122-1 (West 2022). But the procedural bar against successive proceedings will be relaxed if the petitioner (1) can establish cause and prejudice for the failure to assert a postconviction claim in an earlier proceeding or (2) shows a "fundamental miscarriage of justice" based on actual innocence. *People v. Robinson*, 2020 IL 123849, ¶ 42.

¶ 41　　The petition's well-pleaded allegations and supporting documents will be accepted as true unless affirmatively demonstrated by the record that a trier of fact could never accept their veracity." *Id*. ¶ 60. The court may not make factual findings or credibility determinations at the first stage. *Id*. ¶¶ 45, 61. We review *de novo* the denial of leave to file. *Id*. ¶ 39.

¶ 42　　A claim of actual innocence fails only when the petition and supporting documentation cannot show a "colorable claim of actual innocence." *People v. Taliani*, 2021 IL 125891, ¶ 52. A colorable claim is one where the petitioner "raises the probability that 'it is more likely than not that no reasonable juror would have convicted [the petitioner] in the light of the new evidence.' " *People v. Edwards*, 2012 IL 111711, ¶ 24 (quoting *Shlup v. Delo*, 513 U.S. 298, 327 (1995)). The evidence of actual innocence must be (1) newly discovered, (2) material, (3) not cumulative of trial evidence, and (4) of such conclusive character that it more likely than not would have changed the outcome at trial. *Taliani*¸ 2021 IL 125891, ¶ 58.

¶ 43　　　　　　　　　　　　　　　A. Mathews Affidavit

¶ 44　　We first consider Mathews' affidavit, submitted in support of the claim of actual innocence. In codefendant Scullark's most recent appeal, we construed this very affidavit—it

applied equally to Scullark and defendant Adams here in terms of its exculpatory value—and found it to be competent evidence of actual innocence to survive first-stage proceedings. See *People v. Scullark*, 2024 IL App (1st) 220676-U, ¶ 57 (unpublished decision under Supreme Court Rule 23(e)). We borrow generously from our reasoning there below.

¶ 45    As a reminder, among other things, Mathews swore in his affidavit that (1) he "participated in the kidnapping of" Darren Payton, for which he received a 45-year sentence, and "witnessed his murder;" (2) both codefendant Scullark and petitioner here, Adams, were "not involved with or present during the kidnapping or murder of Darren Payton;" (3) he had known both codefendant Scullark and defendant since childhood; and (4) he lived at the house where the party and later the kidnapping and murder occurred, and neither Scullark nor defendant were present at the house at any time on the night in question.

¶ 46    The State concedes that Mathews' affidavit was newly discovered evidence, and rightly so. Mathews was a codefendant charged with and convicted of the same offenses as defendant on a theory of accountability. Petitioner could not have compelled Mathews to come forward earlier with his statement, which placed Mathews at the scene, due to Mathews's fifth amendment right against self-incrimination. *People v. Edwards*, 2012 IL 111711, ¶ 38 ("[n]o amount of diligence could have forced [codefendant] to violate that right if he did not choose to do so."); *People v. Molstad*, 101 Ill. 2d 128, 135 (1984) ("no amount of diligence could have forced the codefendants to violate their fifth amendment right to avoid self-incrimination"); *Scullark*, 2024 IL App (1st) 220676-U, ¶ 40. Mathews's affidavit is newly discovered evidence.

¶ 47    The State claims the affidavit is cumulative of the evidence presented at trial and not material. The State notes that trial testimony was presented that petitioner did not participate in

the crimes and was not present at the scene on the evening of Payton's kidnapping and murder. Because of this, the State contends that the affidavit was cumulative and not material.

¶ 48    The affidavit was unquestionably material. If true, defendant did not participate in any way in this crime. See *People v. Coleman,* 2013 IL 113307, ¶ 96 (new evidence is material if it is relevant and probative of innocence). True, sometimes an individual is culpable by accountability even if not physically present, but that was never the State's theory of the case or the evidence presented. The evidence at trial was that defendant fully participated in the crimes and in fact directed the criminal activity overall.

¶ 49    The State argues that the evidence is cumulative in that other witnesses testified that defendant was not present that night at the house. There is unquestionably some overlap between their testimony and the Mathews affidavit, but as defendant points out, new evidence is considered noncumulative if " 'the evidence adds to what the jury heard.' " *People v. White*, 2014 IL App (1st) 130007, ¶ 24 (quoting *Coleman,* 2013 IL 113307, ¶ 96); see *Ortiz*, 235 Ill. 2d at 335 (cumulative evidence "adds nothing to what was already before the jury.").

¶ 50    The evidence that defendant was not present at the house on the night of the murder came from non-participants in, and non-witnesses to, the crimes. His mother confirmed his whereabouts—at home—before and after her work shift, meaning 10:15 pm on the night of the murder and 8:20 am the next morning. Stephen Kitt testified that he was at the party at the house from 7 pm to 10:30 p.m., never went upstairs, and never saw a person's body being moved. He never saw petitioner, but he did not witness the crimes, either.

¶ 51    Felicia Myles testified that she arrived at the house around 10 pm but did not immediately enter; she went to a liquor store first and then stood around her car socializing with

friends. She was not specific on when she entered the house, though she entered through the back porch and then proceeded to the living room. She never went upstairs and never saw a man bound or injured or any other evidence of the kidnapping or murder. On cross-examination, she was impeached with evidence (which she denied) that she had told police detectives that she had, in fact, seen petitioner at the house that night and that he was directing criminal activities, including activities on the second floor.

¶ 52    Patrick Sims testified he was at the house on April 23 for a party for one to two hours, remaining downstairs, and never saw petitioner or any evidence of criminal activity. He was impeached by the fact that he and petitioner were housed in the same division of Cook County Jail, though he said they were on different tiers and had never spoken to one another.

¶ 53    In contrast, Mathews testified that he fully participated in the kidnapping and that he witnessed the murder of Payton—and that defendant was entirely absent from the criminal activity. He is the only admitted perpetrator who exculpates petitioner. He also was at the party the entire time, as it was his house (as a tenant, not owner) and his party. There is no question that his testimony significantly adds to the testimony of the other witnesses. We thus find the Mathews affidavit noncumulative.

¶ 54    As we did in codefendant Scullark's appeal, we find the newly discovered evidence as averred in Mathews' affidavit to be conclusive as to petitioner here as well. See *Scullark*, 2024 IL App (1st) 220676-U, ¶ 47. Taking the Mathews affidavit as true, "it is more likely than not that no reasonable juror would have convicted petitioner." *Robinson*, 2020 IL 123849, ¶ 61.

¶ 55    Mathews attests that petitioner "was not involved with or present during the kidnapping or murder of Darren Payton," and indeed was "not present at the house party" at all on the night

in question. Even on an accountability theory, the Mathews affidavit exonerates petitioner. *Cf. Edwards*, 2012 IL 111711, ¶¶ 39-41 (co-offender's affidavit, which "d[id] not assert that petitioner was not present when the shooting took place," did not establish innocence where petitioner was convicted under a theory of accountability (emphasis omitted)). Under the State's theory of the case, if petitioner was not present, then he could not have committed the crime, and no rational juror could convict him.

¶ 56     The circuit court found the Mathews affidavit incredible for any number of reasons—its timing (coming after Mathews was released from prison), its contradictions with other affidavits submitted on petitioner's behalf over the course of this litigation, and Mathews' own contradictory accounts of his whereabouts on the night of the murder. As the circuit court noted, Mathews had previously claimed not to have been at the party at all that night.

¶ 57     Valid though those credibility determinations may be, they are appropriate only at the third stage of postconviction proceedings. *Robinson*, 2020 IL 123849, ¶ 61. The fact that other testimony (including Mathew's own) contradicted his current affidavit is not a basis for rejecting it at this stage. Accepted as true, the Mathews affidavit would make it more likely than not that petitioner would be acquitted. We thus reverse the judgment denying petitioner leave to file his actual-innocence petition and remand the cause for second-stage proceedings.

¶ 58                                    B. Evans Affidavit

¶ 59     Petitioner also supported his claim of actual innocence with Lisa Evans's affidavit presenting alibi testimony. Again, we will borrow liberally from our analysis in codefendant Scullark's recent appeal, see *Scullark*, 2024 IL App (1st) 220676-U, ¶¶ 62-86, for Scullark and

petitioner not only share in common the Mathews affidavit—they also each proffered alibi witnesses some 30 years after the crime, though not the same witness.

¶ 60    Recall that Evans swore in her affidavit that petitioner arrived at her home in the "early evening" of April 23, 1993 (the night in question) and remained with her (and her two-year-old nephew under her care) the entire evening until roughly 9:00 AM the next morning. She further swore that she informed a future codefendant, Luckett, of her alibi testimony shortly after the crime, but no attorney or investigator ever contacted her, and thus she never testified at the trial. For his part, petitioner swore in his own new affidavit that he told his attorney to contact Evans, but counsel never did.

¶ 61    Our supreme court has recognized that, to the extent an "affidavit includes information that can be construed as alibi evidence, a petitioner obviously was aware of that information prior to trial." *Id.* ¶ 53. Taken as true, the Evans affidavit demonstrates that a diligent attorney could have secured Evans's testimony, and that trial counsel was not, in fact, diligent in this regard. So the Evans affidavit cannot qualify as newly discovered. *Robinson*, 2020 IL 123849, ¶¶ 47, 53; *Edwards*, 2012 IL 111711, ¶ 38; *People v. Harris*, 206 Ill. 2d 293, 301 (2002); *Scullark*, 2024 IL App (1st) 220676-U, ¶ 61.

¶ 62    Petitioner argues that, because his lawyer failed to secure this testimony through no fault of petitioner, we should consider the evidence "newly discovered" at this juncture. But absent exceptional circumstances, allowing counsel's deficient performance, alone, to allow a petitioner to bypass the "newly discovered" requirement would collapse actual-innocence claims into postconviction *Strickland* claims. See *Scullark*, 2024 IL App (1st) 220676-U, ¶ 65 ("If counsel's

deficiency is precisely what renders the evidence newly discovered, then there is no distinction at all between the two types of claims."). That has never been the law.

¶ 63    And we find so such exceptional circumstances here, given that petitioner has obviously known of this alibi evidence for some 30 years and never made any attempt to bring it to the attention of the court, despite numerous chances to do so. What we said of Scullark, in the identical procedural posture, is true of petitioner here:

> "The problem for petitioner is that it has taken him the better part of 30 years to so much as mention an alibi witness who was known to him before trial. His first and best opportunity to pursue a remedy was immediately after his trial, at a *Krankel* proceeding—a forum literally made for claims like his. See *People v. Krankel*, 102 Ill. 2d 181, 184 (1984) (post-trial allegation giving rise to *Krankel* rule was that "counsel failed to investigate an alibi witness"). He could have alleged his claim in his initial petition, and if, as he now asserts, an affidavit from [the alibi witness] could not be obtained at that time, through no fault of his own, he could have explained why. *** Instead, petitioner said nothing at all about his known alibi until his successive petition. The usual rules for newly discovered evidence apply in this context." *Scullark*, 2024 IL App (1st) 220676-U, ¶ 75.

¶ 64    We have been presented with no decision to the contrary. The closest petitioner comes is *People v. Warren*, 2016 IL App (1st) 090884-C, where we relaxed the "newly discovered evidence" requirement, but the circumstances were vastly different. There, the petitioner alleged his actual innocence in his initial postconviction petition with the aid of counsel. *Id*. ¶ 3. He even obtained four affidavits supporting his actual innocence, but his attorney could not get signatures

on those affidavits in time—so he did not include the affidavits in the petition *at all*, nor did he explain why he did not attach them, as the law allowed him to do. *Id*. ¶¶ 3, 26, 38. The petition was dismissed, in part, for a lack of evidentiary support. *Id.* ¶ 3.

¶ 65    Talk about a textbook case for ineffective assistance in a successive postconviction petition—except that the ineffectiveness occurred at the *postconviction* stage, where no constitutional right to counsel exists, only a statutory right to reasonable assistance of counsel. Postconviction petitions are limited to constitutional claims, and Warren did not have one. So if we did not relax the "newly discovered" bar and allow petitioner to present the four affidavits in a successive petition claiming actual innocence, he would be forever barred from presenting them. Fundamental fairness, in our view, overrode a technical application of a procedural bar to a petitioner who had done just about everything he could possibly do, from prison, to promptly bring this evidence to the court's attention. *Id*. ¶ 130.

¶ 66    The facts here are miles from *Warren*. As we noted above in a lengthy quotation from *Scullark*, petitioner here has had ample opportunity to raise counsel's ineffectiveness since the moment he was convicted, whether it be in a *Krankel* hearing or his original postconviction petition. He argues that he did not raise it earlier because he had yet to locate his alibi witness, Evans, but he could have raised the *Strickland* claim and explained why he was unable to attach her affidavit at that time. See 725 ILCS 5/122-2 (West 2022) (initial postconviction petition shall attach affidavits or other support "or shall state why the same are not attached.").

¶ 67    So we cannot find the Evans affidavit to be newly discovered. In the alternative, as he did below, petitioner asks us to consider this affidavit under the familiar cause-and-prejudice test for successive postconviction petitions claiming ineffective assistance of trial counsel. See *People v.*

*Pitsonbarger*, 205 Ill. 2d 444, 459 (2009) (cause-and-prejudice standard must be satisfied for claims other than actual innocence raised in a successive petition). To show cause, a petitioner must demonstrate "some objective factor external to the defense [that] impeded counsel's efforts to raise the claim in an earlier proceeding." (Internal quotation marks omitted.) *Id*. at 460.

¶ 68     For the reasons already given, petitioner cannot demonstrate "cause" for waiting this long to raise a claim of ineffective assistance of counsel for failing to secure Evans as a witness at trial. Suffice it to say, as we held in *People v. Coleman*, 2023 IL App (1st) 210263, ¶ 22, petitioner here could have alleged his counsel's ineffectiveness on this ground, if not at a *Krankel* hearing, at least at the initial postconviction petition, despite not having located his alibi witness, because he could have alleged "that he was unable to obtain [the alibi witness's] affidavit" (*id*. ¶ 22) until after he had filed his initial petition and thus explained to the court that he "was incapable of supporting his ineffective assistance claim, as required," with an affidavit in that pleading. *Id.* ¶ 23.

¶ 69     And if he were later to locate that alibi witness and procure an affidavit, as he claims to have done here nearly 30 years later, petitioner would have suffered no procedural default, for he had laid the groundwork long before. The failure to take these steps in the initial petition results in a procedural default of the claim without good cause shown. We thus affirm the circuit court's denial of leave to file a successive postconviction petition based on ineffective assistance.

¶ 70                                     II. Assignment of New Judge

¶ 71     As we remand this cause for second-stage proceedings on petitioner's actual-innocence claim, we must reach petitioner's request that the case be assigned to a different judge. Illinois Supreme Court Rule 365(a)(5) (eff. Feb. 1, 1994) permits a reviewing court, at its discretion, to

grant what relief that a particular case may require including the power to reassign a matter to a new judge on remand.

¶ 72    It is not a step we take lightly, nor would we do so based on an adverse or even erroneous ruling alone. See *People v. Vance*, 76 Ill. 2d 171, 181 (1979). We ask whether "fair judgment" is possible in the proceedings on remand. *Eychaner v. Gross*, 202 Ill. 2d 228, 281 (2002).

¶ 73    We exercise that authority here, however, given that the circuit court made numerous credibility determinations at the first stage, not the least of which was referring to the Mathews affidavit as "fiction" and asking counsel to tell petitioner "to get it through his head he killed that guy." Fundamental fairness requires that a fresh set of eyes review this petition going forward. We order the assignment of a new judge on remand.

¶ 74                                                      CONCLUSION

¶ 75    The judgment of the circuit court is reversed insofar as the court denied the advancement of the actual-innocence petition to the second stage of proceedings. We remand the cause to the circuit court to advance the actual-innocence claim to the second stage. The judgment of the circuit court is otherwise affirmed. We order the reassignment of this case to a new circuit judge.

¶ 76    Affirmed in part, reversed in part, remanded with instructions.