2023 IL App (1st) 200106

No. 1-20-0106

Filed March 30, 2023

Fourth Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 03 CR 15616-02 |
| | ) | |
| KEITH BEARD, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE MARTIN delivered the judgment of the court, with opinion.
Presiding Justice Lampkin and Justice Hoffman concurred in the judgment and opinion.

**OPINION**

¶ 1    Keith Beard appeals the circuit court's denial of his motion for leave to file a successive postconviction petition. He argues that affidavits supporting his proposed petition made a colorable claim that he is actually innocent of the aggravated kidnappings of a woman and her two children for which he was convicted and sentenced to 30 years in prison. We find that the affidavits fail to make a colorable claim of actual innocence and affirm the judgment of the circuit court.[1]

_____

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 2                                    I. BACKGROUND

¶ 3                                  A. Beard's Statement

¶ 4        After his arrest on May 18, 2002, Beard agreed to allow Assistant State's Attorney (ASA) Nina Ricci to transcribe his statement regarding the kidnapping of Chanzia Nathan and her two minor children, Brandon and Teighlor (collectively, the Nathans). Beard signed the resulting 8-page statement.

¶ 5        In his statement, Beard reported that he lived at 6729 South Maplewood Avenue in Chicago with his girlfriend, Latoya Joshua, and their two daughters. In the afternoon of May 17, 2002, Beard was at the house of his cousin, Alonzo Brown, when he heard his friend, Leslie Dysart, honking a car horn. Beard went outside and observed Dysart in the driver seat of a maroon Oldsmobile Cutlass. Dysart said he was searching for Ronald Helegar, who is Beard's uncle, and Micah Mannie. After Beard told Dysart he was unaware of their whereabouts, Dysart exited the Oldsmobile and joined Beard in his black Chevy Monte Carlo to search for them.

¶ 6        Dysart informed Beard that Helegar and Mannie had "old girl and them," which Beard understood to mean they had kidnapped Chanzia, Brandon, and Teighlor. The previous day, Dysart told Beard that he, Helegar, and Mannie had a "lick up on a guy named Spook who had a lot of money and a lot of weed." Dysart said that Spook (Rodney Nathan) owned a restaurant and record store. Beard understood "lick" to mean "money scam."

¶ 7        Eventually, Beard and Dysart located Helegar, who then joined them in the Monte Carlo and stated that they "had old girl and them" in Beard's garage. Beard drove Helegar to Beard's garage and then drove Dysart to retrieve the maroon Cutlass. Beard then went to meet Latoya at the hospital where she worked. Beard and Latoya planned to go shopping for new shoes for their daughters. Latoya's friend, Constance Hodges, accompanied them. After Latoya complained that

Beard was driving too fast, he told her that he needed to get home since Helegar and Mannie were stripping parts from a stolen truck in the garage. Latoya was angered by that news and began arguing with him. They continued with their shopping trip and went to a restaurant afterward.

¶ 8 Beard returned to his house on South Maplewood Avenue, where Helegar emerged from the garage and informed Beard that the Nathans were still inside. Beard then drove to a gas station with Latoya and Constance. They returned to the house sometime after 11 p.m. and went inside. Thirty minutes later, Beard went to the garage, where he found Helegar, Mannie, and Dysart. They told Beard they would "take care of him," which Beard understood to mean give him part of the ransom money. Helegar related that Spook had offered a ransom of $30,000, but they were demanding more.

¶ 9 Later, Mannie and Dysart left, intending to meet Rodney to exchange the ransom. The two returned a short time later and reported that "Spook was bulls***ing." Mannie and Helegar entered the garage and Helegar started screaming that "Spook" must not love his family. Helegar handed Chanzia a mobile phone, which was on the line with Rodney, and instructed her to tell Rodney to meet their ransom demands. After the call, the three others left and directed Beard to watch the garage. Beard entered the garage and picked up his shotgun. Chanzia, who was sitting on the floor with something covering her head, asked to join her children who were sitting in a car parked in the garage. Beard allowed her to do so. The others returned and Beard put the shotgun in his basement. Chanzia's cell phone battery was dead, so Beard retrieved Hodges's cell phone. Mannie used Hodges's phone for several calls with Rodney, until that phone's battery died. Beard went inside around 5 a.m. and slept.

¶ 10 Helegar and Mannie woke Beard around 8 a.m., saying they needed Beard to drive them somewhere. Helegar and Mannie, who was holding Brandon by the arm, met Beard outside his

garage and entered his Monte Carlo. Mannie stated they needed to find a pay phone. Beard drove Helegar to the maroon Cutlass, which Helegar began driving. Mannie and Brandon remained in Beard's Monte Carlo. Both cars drove to a pay phone near a Burger King restaurant, where Helegar parked behind Beard. Mannie took Brandon to the pay phone. Police officers arrived a short time later. Beard ran but was eventually tackled, placed in handcuffs, and brought to a police station.

¶ 11    Before trial, Beard filed two unsuccessful motions to suppress his statement. The first motion argued that police lacked probable cause to arrest him. The second motion alleged that Beard was not advised of his *Miranda* rights before giving his statement and that police coerced him by threatening to charge Latoya in the case. Following separate evidentiary hearings, the trial court denied both motions to suppress Beard's statement.

¶ 12                    B. Trial and Direct Appeal

¶ 13    Beard's case proceeded to a bench trial, which was conducted simultaneously with the jury trial of codefendant, Leslie Dysart.

¶ 14    Chanzia Nathan testified that on May 17, 2002, she was working at the restaurant she owned with her husband, Rodney, eponymously named Rodney's. That afternoon, Leslie Dysart entered the restaurant and ordered soup. While ordering, Dysart asked Chanzia about Lisa, Rodney's aunt, who also worked at the restaurant. Chanzia told Dysart that she did not know where Lisa was but was waiting for her. Chanzia explained that Lisa typically relieved her at the restaurant when Chanzia went home with her children.

¶ 15    Chanzia's 7-year-old son, Brandon, and 2-year-old daughter, Teighlor, were both at the restaurant, after spending the day in school and day care, respectively. Around 5 p.m., Chanzia and the children drove in her vehicle to their home, so Brandon could prepare for his baseball practice. After Chanzia parked in front of their house, she noticed a maroon or burgundy colored

vehicle park about two houses behind them. As she was standing on the sidewalk, waiting for the children to exit her vehicle, two men approached her, one with a bat in hand. When the men got near, one said to Chanzia, "you got to come with us." She tried to run but stumbled, dropping her keys in the process. The men grabbed her, shoved her onto the back floor of her vehicle and placed a sweatshirt or jacket over her head. The men grabbed the children and shoved them into the vehicle as well. The men entered the vehicle and drove for about an hour.

¶ 16    Eventually, the vehicle came to a stop. The men directed Chanzia to exit and sit on the concrete floor of a garage with her head still covered. The children were placed inside a different vehicle that was inside the garage. About an hour later, Chanzia's cell phone rang. Her kidnappers told her to answer, since Rodney was calling. After she spoke to Rodney, one of the kidnappers took the phone and demanded money from him. Later, the kidnappers tied Chanzia's hands together. While held in the garage, the kidnappers told Chanzia they would kill her and threatened to beat Brandon "until he was retarded" and to sever Teighlor's fingers. At one point, Chanzia was struck in the head and face with a bat. Other times, the kidnappers poked her with the barrel of a gun and made a clicking sound.

¶ 17    The kidnappers told Chanzia that she and Rodney must think "this is a game." They refused to let Chanzia speak with Rodney any further but later took Brandon to speak with him by phone. After several hours, the kidnappers allowed Chanzia to join her children in the vehicle. In the morning, Chanzia heard police officers announce themselves as they entered the garage.[2] She removed the cover from her head. Initially, police asked her to stay put, but later told her it was safe to exit the vehicle. Upon exiting the garage, Chanzia observed police officers detain Dysart in the back yard of the house adjacent to the garage. Later, Chanzia identified Micah Mannie and

---

[2]Seven pages of the transcript of Chanzia's direct examination testimony are absent from the record on appeal.

Ronald Helegar in photo arrays as the two men who abducted her in front of her home. She identified Beard as looking familiar, but not one of the men who abducted and confined her.

¶ 18    Brandon Nathan testified that he went to his father's restaurant after school on May 17, 2002. There, he overheard Dysart ask his mother when Lisa would be working. Later, as he rode in his mother's vehicle, he noticed a car following them. Consistent with Chanzia's account, Brandon described being apprehended by two men in front of their home. He, too, identified the two men as Mannie and Helegar. After being held overnight in a garage, Beard, Mannie, and Helegar took Brandon to a pay phone to call his father. Brandon specifically identified Beard as one of the people who drove with him to the pay phone. Upon arriving at the pay phone, Brandon exited the car with Mannie, while Beard remained in the driver seat. After speaking with his father, police arrived on the scene and arrested Mannie and Beard. Officers then transported Brandon to Beard's garage, where Brandon observed Dysart outside.

¶ 19    Torrence Lewis, a Chicago police sergeant, testified that he was assigned to investigate the Nathans' kidnapping, which Rodney reported. Police monitored and traced the phone calls between Rodney and the kidnappers, who sometimes used pay phones. Around 3 a.m. on May 18, 2002, Lewis surveyed Mannie speaking on a pay phone. By radio with other officers, Lewis learned that Rodney was on the phone with a kidnapper, and Mannie hung up at the same time Rodney's call terminated. After ending his phone call, Mannie entered a maroon Oldsmobile Cutlass with a passenger inside and drove away. Later, around 9 a.m., Lewis was alerted that the kidnappers and Brandon were using a pay phone at 69th Street and South Halsted Street to speak with Rodney. Lewis went to that location and observed Mannie, holding Brandon by the shoulder, beside a pay phone, with Helegar standing nearby. Lewis, dressed in plain clothes, walked toward the phone and rummaged through his pocket as though he were searching for change to use the

phone. When he got near, Lewis drew his weapon, announced he was a police officer, and grabbed Mannie. While Lewis wrestled Mannie to the ground, Helegar ran away. Beard promptly climbed out of the window of a black Monte Carlo parked bumper to bumper with the same maroon Oldsmobile Cutlass that Lewis had observed Mannie enter earlier that morning. Beard ran south on Halsted Street. Lewis relayed that information via radio, so other officers could apprehend Beard and Helegar.

¶ 20   Chicago Police Officer William Meador testified that around 9 a.m. on May 18, 2002, he was near the corner of 69th and Halsted Streets when he heard a radio transmission from Sergeant Lewis, indicating that a suspect was fleeing on foot southbound on Halsted Street. Meador drove south on Halsted Street in a marked police vehicle, until he observed a person, matching the description that Lewis gave, turn east onto 70th Street. Meador followed. After the suspect looked in the direction of Meador's vehicle, he turned and ran south. Meador pursued him on foot and arrested the suspect, whom he identified as Beard. Meador transported Beard back to the corner of 69th and Halsted Streets, where Lewis identified Beard as a person who fled from him earlier when he apprehended Mannie.

¶ 21   Detective Michael Baker of the Chicago Police Department testified that he was assigned to investigate the kidnapping. On the morning of May 18, 2002, he went to the corner of 69th and Halsted Streets, where he spoke with Beard, who was then in police custody. Beard stated that Chanzia and Teighlor were being held in the garage at 6729 South Maplewood Avenue by another person. Baker proceeded to the Maplewood Avenue address, where he and other officers found Dysart in the garage. After being arrested, Dysart directed police to a sawed off shotgun in a storage area. Police recovered the shotgun and live cartridge cases.

¶ 22        Rodney Nathan testified that he was working at his restaurant on May 17, 2002. Dysart, who Rodney knew, came in that day and asked Chanzia when Lisa would be coming to the restaurant. After Chanzia left with their children, Rodney tried calling Chanzia, but she did not answer. Later, he received a call from her, saying that someone wanted to speak with him. Another voice came on the line and demanded money and drugs in exchange for Chanzia and their children's safe return. Rodney went to the police and reported that his wife and children had been kidnapped. Rodney continued to receive phone calls with similar demands as police recorded the calls.

¶ 23        ASA Nina Ricci testified that she interviewed Beard at a police station following his arrest and that he agreed to give a statement. Ricci transcribed the statement, which Beard then reviewed and signed. ASA Ricci then read Beard's statement into evidence.

¶ 24        Beard chose not to testify or call any witnesses.

¶ 25        After closing arguments, the trial court stated that it was undisputed that the Nathans were kidnapped for the purpose of ransom. The court reiterated that it found that Beard's statement was voluntary, as it had found when denying his second motion to suppress. The court further noted that Beard's statement begins as though he was merely a witness to events surrounding the kidnapping—including that Dysart told him of the plan and later informed Beard that the Nathans were held in his garage—rather than a participant in it. But after a point, the court observed that Beard "gets involved up to his neck with the kidnapping," which was ongoing and not limited to the Nathans' abduction in front of their house. In addition, the court noted that circumstantial evidence supported that Mannie, Helegar, and Dysart acted in concert with Beard, especially that they took the Nathans to Beard's garage the day after Dysart had told Beard about the plan to kidnap them. The court observed that, even if he had not been involved earlier, Beard took actions

to facilitate the kidnapping for ransom: (1) he entered the garage armed with a shotgun to prevent the Nathans from leaving while the other defendants were away on an errand, (2) he kept a lookout to prevent discovery of the kidnapping, (3) he obtained Hodges's cell phone to continue making ransom demands after the battery in Chanzia's phone died, and (4) he drove Mannie, Helegar, and Brandon to make another ransom demand call at a pay phone. The facts also show that Beard had attached himself to the kidnapping, including that he was going to receive a portion of the ransom money, fled from police, and, after capture, informed police of the location of the garage where the Nathans were confined and Dysart was holding them. Ultimately, the court found that Beard was "involved *** from the beginning, but even if he was not, he's clearly accountable in any event." The court found Beard guilty on three counts of aggravated kidnapping for ransom and later sentenced him to concurrent terms of 30 years on each count.

¶ 26 On direct appeal, Beard only challenged his requirement to register pursuant to the Sex Offender Registration Act (730 ILCS 150/1 *et seq.* (West 2002)) and Sex Offender and Child Murderer Community Notification Law (730 ILCS 152/101 *et seq.* (West 2002)). We affirmed. *People v. Beard*, 366 Ill. App. 3d 197 (2006).

¶ 27 C. Postconviction Proceedings

¶ 28 In 2005, Beard filed an initial *pro se* postconviction petition, asserting various claims of ineffective assistance of trial and appellate counsel. He also argued that his sentence was unreasonably disparate from the sentence the court imposed on Dysart, who Beard asserted to be similarly accountable for the kidnapping. The trial court summarily dismissed Beard's petition and this court affirmed. *People v. Beard*, No. 1-06-0783 (2007) (unpublished order under Illinois Supreme Court Rule 23).

¶ 29     In 2012, Beard filed a *pro se* motion for leave to file a successive postconviction petition, claiming actual innocence. Beard asserted that he would present affidavits from Ronald Helegar, Alonzo Brown, Constance Hodges, James Cooks, Evangeline Beard, and Jennifer Beard-Washington to demonstrate that he was actually innocent of the aggravated kidnappings. However, he failed to include any affidavits with his motion. The circuit court found that Beard's failure to attach supporting affidavits was fatal to his claim and, therefore, denied his motion for leave to file a successive postconviction petition. Beard filed a notice of appeal and included affidavits from Helegar, Brown, Hodges, Cooks, and Evangeline Beard. Each affidavit was dated as attested to in 2011, except for Helegar's, which was dated in 2008. On appeal, appointed counsel requested to withdraw and filed a memorandum, pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987), outlining reasons why counsel concluded the appeal was frivolous. We found no issues of arguable merit, allowed counsel to withdraw, and affirmed the circuit court's judgment. *People v. Beard*, No. 1-12-0917 (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 30     In 2018, Beard, through counsel, filed a second motion for leave to file a successive postconviction petition. As he had done in his 2012 motion, Beard again asserted actual innocence based on attached affidavits from Helegar, Mannie, Evangeline Beard, Brown, Cooks[3], and Hodges. He also claimed that he was sentenced on counts that the State nol-prossed before trial, his sentence was disparate from Dysart's, and his trial counsel was ineffective for failing to present alibi witnesses.

¶ 31     In a 2014 affidavit, Helegar attested as follows:

---

[3]Although referenced, Cooks's affidavit was not included with the 2018 motion and proposed petition. An affidavit from Cooks, attesting that he and Beard were drinking together and went to a night club from the late evening on May 17, 2002, until 3 a.m. on May 18, was included with Beard's notice of appeal from the denial of his 2012 motion.

"On May 17, 2002. I, Ronald Helegar, knew and had contact with Micah Mannie and Leslie Dysart, who planned and pursued the kidnapping of Chanzia Nathan, Brandon Nathan, and [Teighlor] Nathan. I, Ronald Helegar and Micah Mannie kidnapped Chanzia Nathan and her two children *** from in front of their home while Leslie Dysart sat in a car and followed us. We drove around for a while until we thought of a place to take them, which was a garage. Keith Beard, whom's [*sic*] garage it was didn't have anything to do with the planning and pursuing of the kidnapping. Keith Beard never had any physical or verbal contact with any of the victims. Keith Beard did not aid or provide us with a cell phone to make any of the calls that was made [*sic*]. Nor did he provide us with a shot gun or shells. He never looked after the victims.

On May 18, 2002, I, Ronald Helegar and Micah Mannie drove Brandon Nathan to the pay phone in the maroon Cutlass that was recovered at 69th [and] Halstead [*sic*]. Keith Beard did not drive with us to pick up any ransom. Leslie Dysart was left at the garage watching over Chanzia Nathan and [Teighlor]. Keith Beard had no involvement in this crime."

Helegar states that he would appear if he were "called to testify to the truth of this."

¶ 32     In a 2014 affidavit, Micah Mannie states that he was arrested on May 18, 2002, in connection with the kidnapping of the Nathans. He recounts that he was held handcuffed to a wall in an interrogation room at a police station for over 24 hours. He attests that after he refused to "sign some papers," two detectives threatened and physically abused him. Eventually, he relented and agreed to sign a statement implicating himself in the kidnapping. Additionally, Mannie claims that a detective told him he would be "cleared" if he signed a statement implicating Beard, since "someone had to take the fall." Regarding Beard, Mannie attests as follows:

"On May 17th of 2002, I never seen Keith Beard, I had never personally known Keith Beard prior to this crime. We had never hung out, planned, nor pursued anything together. On May 18th, 2002, I was not in the presence of Keith Beard, nor accompanied by him anywhere, nor did we commit a crime together.

* * *

Keith Beard had no knowledge or involvement in the crime for which he sits incarcerated and convicted for."

Ultimately, Mannie states that he was forced to implicate "an innocent person"—Beard—"in [a] crime he had no knowledge of and did not commit."

¶ 33        Evangeline Beard, in a 2016 affidavit, states that Beard is her son and Helegar is her brother. Evangeline[4] recounts that she visited Helegar while he was being held in the Cook County jail sometime in June 2004. Helegar told her that Beard "did not have anything to do with the crime [Helegar] and his friends committed." Helegar also "expressed how sorry he was for what he had done and for getting my son [Beard] involved in something he had nothing to do with." Evangeline stated that she had contacted Beard's attorney and conveyed what Helegar had told her, but the attorney explained that "it was too late to take the stand on [Beard's] behalf because his [trial] was over." She attended Beard's sentencing hearing but "never got a chance to tell the court what [Helegar] had told [her]."

¶ 34        In a written order, the circuit court denied Beard's motion for leave to file a successive postconviction petition. The court found that Helegar and Evangeline's affidavits were not newly discovered since, by attaching copies to his prior notice of appeal, the record demonstrated that Beard had substantially similar affidavits from each person before he filed his 2012 petition, which

---

[4]We refer to Evangeline Beard by first name to distinguish her from the petitioner.

omitted them. Regarding Mannie's affidavit, the court found that it failed to demonstrate Beard's innocence. The court noted that, taking the affidavit as true, it indicates that Mannie had no knowledge of the kidnapping, nor of Beard's whereabouts during its commission, and evidence that Mannie was coerced to give a false statement implicating Beard in the crime would not change the outcome of Beard's trial, since no such statement was introduced. For those reasons, the court found that Beard had not made a colorable claim of actual innocence. Separately, the court found that Beard failed to demonstrate cause or prejudice to be entitled to leave to file a successive petition for his other two claims. Beard filed a timely notice of appeal.[5]

¶ 35                                    II. ANALYSIS

¶ 36        The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)) provides a statutory remedy to criminal defendants who assert that substantial violations of constitutional rights occurred at their trial. *People v. Edwards*, 2012 IL 111711, ¶ 21. The Act is not a substitute for a direct appeal but affords a mechanism for collateral attack on a final judgment of conviction. *Id.* Accordingly, issues actually decided on direct appeal are barred by *res judicata* and issues that could have been raised, but were not, are forfeited. *People v. Blair*, 215 Ill. 2d 427, 442 (2005). In addition, a petitioner may file only one petition without leave of court and claims not raised in an original or amended petition are deemed waived. 725 ILCS 5/122-1(f), 122-3 (West 2018).

¶ 37        To file a successive petition, a petitioner must first obtain leave of court. *Edwards*, 2012 IL 111711, ¶ 24. The Act recognizes only two bases to grant leave: (1) a colorable claim of actual innocence or (2) cause for failure to include the claim in an earlier proceeding with resulting prejudice. *People v. Robinson*, 2020 IL 123849, ¶ 42. Claims of trial error are assessed under the

---

[5]After filing an initial brief, Beard's counsel died. We appointed the State Appellate Defender to represent him. Later, private counsel appeared in the case and requested to file an amended opening brief, which we permitted.

cause and prejudice standard. *People v. Coleman*, 2013 IL 113307, ¶ 91. For actual innocence, a petitioner must submit supporting evidence that is (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial. *Robinson*, 2020 IL 123849, ¶ 47. We review the circuit court's denial of leave to file a successive postconviction petition *de novo*. *People v. Horton*, 2021 IL App (1st) 180551, ¶ 41. In our review, we take all well-pleaded allegations in the petition and supporting affidavits as true unless positively rebutted by the record. *Robinson*, 2020 IL 123849, ¶ 45. However, nonfactual and nonspecific assertions that merely amount to conclusions are insufficient. *People v. Mabrey*, 2016 IL App (1st) 141359, ¶ 19.

¶ 38        In his amended brief, Beard only challenges the circuit court's assessment of his actual innocence claim. As noted, a petitioner must submit supporting evidence that is (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial. *Robinson*, 2020 IL 123849, ¶ 47. Evidence is "newly discovered" when it was discovered after trial and the petitioner could not have discovered it earlier through due diligence. *Id.* "Material" means the evidence is relevant and probative of the petitioner's innocence. "Not cumulative" means the evidence adds to the information the fact finder heard at trial. *Id.* Evidence is of "conclusive character" when, considered along with the trial evidence, it would probably lead to a different result. *Id.* The conclusive character of new evidence is the most important element. *Id.* It need not be entirely dispositive or totally exonerate the defendant, but it must place the trial evidence in a different light and undermine our confidence in the judgment of guilt. *Id.* ¶ 48. Leave to file should be granted where the supporting documentation raises the probability that it is more likely than not that no reasonable juror would have convicted the defendant in light of the new evidence. *Id.* ¶¶ 44, 50.

¶ 39    Here, Beard argues that he should be granted leave to file a successive postconviction petition because his supporting affidavits set forth a colorable claim of actual innocence. He relies only on the affidavits from Helegar, Mannie, and Evangeline. He advances no arguments for consideration of the affidavits from Brown, Hodges, or Cooks.

¶ 40    At the outset, the parties dispute whether Beard's failure to include affidavits, which were available to him, in his prior postconviction proceeding, bars him from relying on those same affiants in his current motion for leave to file an actual innocence claim. Put differently, the issue is whether such affidavits can be considered newly discovered when they could have been included in a prior petition. Like the circuit court, we observe that the affidavits from Helegar and Evangeline attached to Beard's 2018 motion are substantially similar or identical to affidavits he submitted with his notice of appeal from the denial of his 2012 motion for leave to file a successive petition. The affidavits attached to the notice of appeal indicated that each one was executed before Beard filed his 2012 motion, which referred to but omitted the affidavits.

¶ 41    When faced with comparable circumstances, separate panels of this court have reached different conclusions. In *People v. Smith*, 2015 IL App (1st) 140494, a petitioner supported an actual innocence claim in his amended petition with an affidavit from a witness who recanted his identification of the petitioner at trial. The State argued that the affidavit was not newly discovered, since the petitioner failed to show that he could not have discovered the witness's recantation before the time the witness stated that he contacted the petitioner, which was 11 years after the events in question and 5 years after the trial. *Id.* ¶¶ 12, 19. The court rejected that argument, reasoning that the petitioner need only show that he could not have discovered the recantation prior to trial. *Id.* ¶ 19. The petitioner in *Smith* did so because the witness believed he had accurately identified the petitioner at that time. *Id.*

¶ 42          In *People v. Wideman*, 2016 IL App (1st) 123092, a petitioner's motion for leave to file his second successive petition asserted that he relied on newly discovered affidavits to claim actual innocence for his role in a beating death. *Id.* ¶¶ 28-29. His initial and first successive petitions claimed actual innocence as well. *Id.* ¶¶ 26-27. On the third try, no affidavits were attached, and the court denied the motion for that reason. *Id.* ¶ 30. The petitioner then filed a motion to reconsider and attached, for the first time, an affidavit from a particular witness attesting to the petitioner's innocence. *Id.* ¶ 31. This effort was unsuccessful, and he appealed. *Id.* ¶¶ 34-35. In determining whether the affidavit was newly discovered, the *Wideman* court recognized that *Smith* limited the focus of the inquiry to whether the evidence was available at the time of trial. *Id.* ¶ 56. However, the court distinguished *Smith* as involving a supplemented initial petition, rather than a successive petition like the one before it. The court then looked to precedent, including, *People v. Snow*, 2012 IL App (4th) 110415 and *People v. English*, 403 Ill. App. 3d 121 (2010), to conclude that "the desire to avoid 'piecemeal post-conviction litigation' " and *res judicata* principles warrant consideration of whether the evidence was available when the petitioner filed previous postconviction pleadings. *Wideman*, 2016 IL App (1st) 123092, ¶ 58 (quoting *People v. Ortiz*, 235 Ill. 2d 319, 332 (2009)). Thus, the court adopted the rule that " 'if the evidence was available at a prior posttrial proceeding, the evidence is *** not newly discovered evidence.' " *Id.* ¶ 57 (quoting *Snow*, 2012 IL App (4th) 110415, ¶ 21); see also *People v. Warren*, 2016 IL App (1st) 090884-C, ¶ 114 (citing *Snow* for the same proposition). Applying that rule, the court found that the affidavit was not newly discovered, since the petitioner failed to explain why he could not have obtained the affidavit to include with his earlier petitions. Therefore, the petition was precluded by *res judicata*. *Wideman*, 2016 IL App (1st) 123092, ¶ 62.

¶ 43        Beard argues that we should follow *Smith*, limiting our consideration to only whether evidence was discoverable prior to trial, and disregard *Wideman*, since that opinion mistakenly relied on the Fifth District's opinion in *English* to reach its conclusion. We agree. *Wideman* and *Snow* cited *English* for the proposition that *res judicata* requires that, if evidence was available for a prior postconviction petition, it cannot be considered newly discovered for a subsequent actual innocence claim. Our reading of *English* does not support that broad conclusion.

¶ 44        In *English*, a petitioner claimed both ineffective assistance of trial counsel and actual innocence in a successive petition. *English*, 403 Ill. App. 3d at 125. Both claims relied, in part, on the affidavit of a witness attesting that English was at his mother's home, along with three other friends, at the time of the double shooting for which he was convicted. *Id.* at 125-26. The petitioner claimed his counsel was ineffective for failing to call that witness and others to advance an alibi defense. *Id.* At the same time, he claimed that the witness's affidavit demonstrated his actual innocence. *Id.* However, in his initial petition, English claimed, *inter alia*, the same alibi—that he was at his mother's home along with the same three friends—and that his trial counsel was ineffective for failing to present two of them to testify to his alibi. *Id.* at 123-24. The court observed that English's actual innocence claim amounted to a reiteration of the same ineffectiveness claim he raised in his initial petition. *Id.* at 132, 134. In analyzing his separate claims, the court first found that English could not establish cause to file a successive ineffective assistance claim based on failure to present alibi witnesses, since English himself attested that he was with the newly identified witness at the time in question and could have included that witness when he asserted the claim in his initial petition. *Id.* at 132. The court then went on to consider English's actual innocence claim and found that the new witness's alibi testimony was not newly discovered for the same reason—English himself attested that he was with the witness at the time of the shooting.

*Id.* at 133. The court remarked that English "had this information available to him both at the time of trial and when he filed his initial postconviction petition." *Id.*

¶ 45    The *Snow* and *Wideman* courts seem to have relied on this remark to derive the rule that evidence available in prior postconviction proceedings is not newly discovered, irrespective of whether it was discoverable before trial. But *English* does not support that rule. The affidavit at issue in *English* was not newly discovered because it was known to the petitioner before trial. *Id.* This reason alone was sufficient to defeat the actual innocence claim. The court's remark noting that the affidavit was available for the initial petition was surplusage that echoes its prior conclusion that English lacked cause to rely on the affidavit to again claim ineffective assistance.

¶ 46    The rule that the *Wideman* and *Snow* opinions apply conflates the newly discovered analysis for actual innocence with the cause analysis for the cause and prejudice test. Those are separate, distinct inquiries. The cause and prejudice test applies only to claims of trial error. *Coleman*, 2013 IL 113307, ¶ 91. A claim of trial error is forfeited when a petitioner could have but failed to include it in a prior petition. *Blair*, 215 Ill. 2d at 444.

¶ 47    Generally, forfeiture is encompassed within the doctrine of *res judicata*. *Wilson v. Edward Hospital*, 2012 IL 112898, ¶ 9 (stating that *res judicata* "extends not only to all matters that were actually decided but also to those matters that could have been decided in the prior action."). However, forfeiture differs significantly from *res judicata*. Forfeiture refers to the preclusion of an issue that could have been raised but was not. *Blair*, 215 Ill. 2d at 444. *Res judicata*, on the other hand, bars consideration of issues that were previously raised and decided on direct appeal. *Id.* at 443. It applies where an issue " 'has been definitively settled by judicial decision.' " *Id.* (quoting Black's Law Dictionary 1336-37 (8th ed. 2004)). Understanding this difference, we can reason that the justification for preclusion is stronger when a litigant is merely attempting to

reassert the same claim, which was already heard and decided, in the hope of finding a more receptive ear. In these circumstances, preclusion more closely relates to the substance of the claim because the claim has been determined to lack merit. Forfeiture due to omission in a prior proceeding is harsher; preclusion relates less to the substance of the claim. Rather, it punishes a litigant for their neglect or lack of legal competence and results in their claim never being considered on the merits.

¶ 48    Likewise, trial errors and actual innocence are qualitatively different. While both pertain to fundamental fairness, imprisonment of a factually innocent person is a fundamental miscarriage of justice. *People v. Taliani*, 2021 IL 125891, ¶ 55. It is so conscience shocking as to trigger substantive due process. *Id.* ¶ 57. The same is not necessarily so with trial error. Since an actual innocence claim asserts a graver deprivation of rights, we find that forfeiture should not preclude consideration of evidence offered in support of such a claim. Rather, preclusion should only apply when the evidence has been previously considered and definitively ruled upon. We believe this conclusion is consistent with our oft-repeated principle that, when evaluating evidence offered to support an actual innocence claim, the most important element is whether the evidence is of such conclusive character that it would probably change the result on retrial. *Robinson*, 2020 IL 123849, ¶ 47.

¶ 49    Here, the affidavits from Helegar and Evangeline were available to Beard when he filed his initial petition. However, his petition was dismissed solely for failure to attach supporting affidavits. No definitive ruling was reached on their merits. Absent such a ruling, we are not precluded from considering the affidavits as newly discovered evidence; nor does preclusion follow from the fact that they were available for the prior petition. We only consider whether the evidence was discoverable before trial.

¶ 50    Helegar and Mannie were Beard's codefendants in this matter. Statements of a codefendant are considered newly discovered, since no amount of diligence could have forced them to testify. *Edwards*, 2012 IL 111711, ¶ 38. Accordingly, Helegar and Mannie's affidavits are newly discovered evidence. Similarly, Evangeline's affidavit reports what Helegar conveyed to her.[6] Further, she states her conversation with him occurred after Beard's trial. Thus, this affidavit is also newly discovered evidence.

¶ 51    Nevertheless, we find that Beard's supporting affidavits fail to make a colorable claim of actual innocence. To begin, it is important to recognize that Beard was convicted based on his accountability. A defendant is accountable for the conduct of another when evidence shows "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2002). Intent to promote or facilitate a crime may be proven by evidence that either the defendant shared the criminal intent of the principal or a common criminal design. *People v. Fernandez*, 2014 IL 115527, ¶ 13.

> "[I]f two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts." (Internal quotation marks omitted.) *Id.*

A common design can be inferred from the circumstances surrounding the perpetration of the crime. *People v. Taylor*, 164 Ill. 2d 131, 141 (1995). Evidence that a defendant voluntarily attached himself or herself to a group "bent on illegal acts," with knowledge of the group's design, supports an inference that the defendant shared the group's common purpose, and such evidence is

---

[6]The rules of evidence do not apply to postconviction proceedings, making hearsay admissible. *People v. Velasco*, 2018 IL App (1st) 161683, ¶¶ 114-16; Ill. R. Evid. 1101(b)(3) (eff. Sep. 17, 2019).

sufficient to sustain the defendant's conviction for an offense committed by another member of the group. *People v. Garcia*, 2019 IL App (2d) 161112, ¶ 27 (citing *Fernandez*, 2014 IL 115527, ¶ 13).

> "In evaluating whether a defendant is legally accountable for the actions of another, the trier of fact may consider factors such as whether the defendant was present during the perpetration of the offense, whether he fled from the scene, whether he maintained a close affiliation with his companions after the commission of the crime, and whether he failed to report the crime." *Id.* (citing *Fernandez*, 2014 IL 115527, ¶ 17).

¶ 52        As the trial court observed when finding Beard guilty, the defendant voluntarily attached himself to the kidnapping for ransom with knowledge of its design. In Beard's statement, he admitted that Dysart informed him of the kidnapping plan the day before the Nathans were abducted. Further, Dysart informed Beard that the Nathans were confined in Beard's garage in the late afternoon or early evening of May 17, 2002. Beard also admitted that he met with Helegar, Mannie, and Dysart at his garage while the Nathans were confined there and was told he would receive part of the ransom money. He further admitted to retrieving a cell phone for the others to make ransom calls and entering the garage with a shotgun to check on the Nathans. Brandon testified that Beard admitted that he drove Brandon and Mannie to the pay phone at the corner of 69th and Halsted Streets. The fact that the Nathans were confined in Beard's garage, and that many hours passed between Beard learning they were there and his arrest, further supports the inference that Beard was involved. While the trial court believed that Beard was more involved than his statement admitted, the evidence from his statement alone was more than sufficient to prove that Beard (1) had knowledge of the group's design to kidnap the Nathans for ransom, (2) voluntarily attached himself to the group, and (3) attempted to aid the group with the intent to facilitate the

kidnapping for ransom. In addition, Beard's accountability was corroborated by (1) Brandon's testimony that Beard drove him with Mannie to the pay phone, (2) Sergeant Lewis's testimony that he observed Beard flee from his Monte Carlo, which was parked bumper to bumper with Helegar's Cutlass, when he apprehended Mannie a few feet away, and (3) Officer Meador's testimony that he located Beard running a short distance from 69th and Halsted Streets. Beard's flight when police officers arrived further implied that he was conscious of his involvement in the kidnapping. *People v. Aljohani*, 2021 IL App (1st) 190692, ¶ 64.

¶ 53    All three of the affidavits that Beard relies on are rife with conclusory statements. We can disregard them for that reason alone. *People v. Burt*, 205 Ill. 2d 28, 35-36 (2001) ("nonfactual and nonspecific assertions which merely amount to conclusions are insufficient"). For instance, Helegar states that Beard "didn't have anything to do with the planning and pursuing of the kidnapping." Evangeline relates that Helegar told her that Beard "did not have anything to do with the crime." And Mannie asserts that "Beard had no knowledge or involvement in the crime." Even putting aside their conclusory nature, such statements have been found insufficient to make a colorable claim of actual innocence when the trial record establishes a defendant's accountability. See, *e.g.*, *Edwards*, 2012 IL 111711, ¶ 39 (assertions that the petitioner " 'had nothing to do with this shooting' " and was neither " 'a part [of nor] took part in this crime' " fail to show innocence for a defendant convicted under a theory of accountability).

¶ 54    Helegar's affidavit contains a few more specific allegations. Helegar admits to his, Mannie, and Dysart's actions of abducting the Nathans, transporting them, and confining them in Beard's garage. He states that Beard did not provide a cell phone for ransom calls or a shotgun. He denies that Beard watched the Nathans or had any contact with them. Helegar further denies that Beard drove him, Mannie, and Brandon to the pay phone at 69th and Halsted Streets. The theme running

through Helegar's affidavit is that Beard did not actively participate in the actions related to the Nathans' kidnapping. But "[a]ctive participation in the offense is not required" if the defendant was part of a common criminal design. *Garcia*, 2019 IL App (2d) 161112, ¶ 27 (citing *Taylor*, 164 Ill. 2d at 140). It is of no moment whether Beard actively participated in physically abducting or confining the Nathans or planning their kidnapping. As we noted, the trial evidence demonstrated that Beard attached himself to the common design of the kidnapping for ransom.

¶ 55      We also observe that Helegar's denial that Beard drove to the pay phone at 69th and Halsted Streets is positively rebutted by the record. An allegation in an affidavit supporting a postconviction petition is positively rebutted when the trial record demonstrates that no fact finder could ever accept the truth of the allegation. *Robinson*, 2020 IL 123849, ¶ 60. As we observed, substantial evidence from multiple sources placed Beard inside his vehicle at the scene. Moreover, Beard admitted that he drove there. He also fled from the scene and was arrested a short time and distance away. Beard's participation in the trip with Mannie, Helegar, and Brandon to the pay phone at 69th and Halsted Streets, along with surrounding circumstances, convincingly proves Beard's accountability. With this trial evidence, no fact finder could ever accept the truth of Helegar's bare denial that Beard did not take part.

¶ 56      The same evidence also demonstrates that no fact finder could ever accept the truth of Mannie's more general assertion that he and Beard were not in each other's presence on May 18, 2002. Apart from Mannie's conclusory statements, he claims that he was forced to falsely implicate Beard in the kidnapping. This is not material to Beard's innocence, since no statement from Mannie was used to convict Beard. Indeed, such a statement likely could not have been introduced at trial due to Beard's right to confront witnesses and Mannie's privilege against self-

incrimination. See *Bruton v. United States*, 391 U.S. 123 (1968). Beard's conviction rests on evidence wholly independent of any statement Mannie may have given.

¶ 57    In sum, with the overwhelming evidence of Beard's accountability for the kidnapping for ransom, the supporting affidavits fail to place the trial evidence in a different light or undermine our confidence in Beard's guilt. They likewise fail to raise a reasonable probability that no fact finder would convict on retrial.

¶ 58                                         III. CONCLUSION

¶ 59    For these reasons, we find that Beard failed to make a colorable claim of actual innocence. Accordingly, we affirm the circuit court's denial of his motion for leave to file a successive postconviction petition.

¶ 60    Affirmed.

***People v. Beard*, 2023 IL App (1st) 200106**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 03-CR-15616-02; the Hon. Stanley J. Sacks, Judge, presiding. |
| **Attorneys for Appellant:** | Ian M. Barney and Madison N. Heckel, of Barney & Hourihane, LLP, of Evanston, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Brian K. Hodes, and Susan Wobbekind, Assistant State's Attorneys, of counsel), for the People. |