2024 IL App (1st) 220676-U

SECOND DIVISION
March 29, 2024

No. 1-22-0676

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 93 CR 12311 |
| | ) | |
| SHERMAN SCULLARK, | ) | Honorable |
| | ) | Stanley Sacks, |
| Petitioner-Appellant. | ) | Judge Presiding. |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Howse and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1     *Held*:  Affirmed in part, reversed in part, remanded with instructions. Petitioner alleged colorable claim of actual innocence but did not show cause for failure to raise ineffectiveness claim in initial petition. Petition remanded for second-stage proceedings on innocence claim and reassignment to new judge, as circuit court made extensive credibility findings at leave-to-file stage.

¶ 2     Petitioner Sherman Scullark was convicted of kidnapping and murdering Darren Payton. He now appeals from the denial of leave to file his second successive post-conviction petition, in which he alleges his actual innocence and his trial counsel's ineffectiveness. Taking the relevant supporting affidavits as true, we find that he has stated a colorable claim of actual innocence but has failed to establish cause for the procedural default of his ineffectiveness claim. We thus grant petitioner leave to file his actual-innocence claim. In an abundance of caution, given the circuit

court's extensive and premature credibility judgments at the leave-to-file stage, we order the case reassigned to a new judge for second-stage proceedings.

¶ 3                                    BACKGROUND

¶ 4                    I. Overview of trial and postconviction proceedings

¶ 5      We begin with a brief summary of pertinent trial evidence to provide background and context for the limited issues now before us. A more comprehensive discussion can be found in our decision affirming the denial of the initial postconviction petition. See *People v. Scullark,* No. 1–06–3267 (2009) (unpublished order under Supreme Court Rule 23); see also *People v. Scullark*, 2015 IL App (1st) 120962-U, ¶¶ 7-16.

¶ 6      Petitioner was one of six members of the Conservative Vice Lords gang convicted of kidnapping and murdering Payton, a fellow gang member who had allegedly violated the gang's rules. The evidence against petitioner came principally from the testimony of Ronald Glover and Devon Fountain, two members of the gang. In exchange for his testimony against petitioner, the State agreed to drop Glover's pending murder charges and propose a 10–year sentence for his aggravated kidnapping conviction. Fountain was never charged in connection with Payton's death. The Cook County State's Attorney's Office kept both Glover and Fountain in witness protection before the trial.

¶ 7      Glover and Fountain testified that, in the late afternoon and evening of April 23, 1993, they were at a house at 229 West 110th Place in Chicago, Illinois where petitioner, along with codefendants Delandis Adams, Darnell Luckett, Manuel Mathews, Dwan Royal, and Marvel Scott, held Payton captive. Payton was bound and blindfolded in an upstairs room. Adams told

Glover that Payton was being punished for violating the gang's rules. Fountain testified that Payton was bleeding from his mouth, and Glover testified that he heard "bumps" and screaming from the room where Payton was held. At one point, they brought a piece of lumber into the room where Payton was bound, after which Glover heard more "bumping" noises.

¶ 8     Glover testified that petitioner and the other codefendants eventually carried Payton, who was wrapped in a blanket, blindfolded, and had a cord wrapped around his neck, out to a white car and put him in the trunk. Glover testified that Scott drove the car away. Fountain did not see them put Payton in the white car, but he testified that he saw Adams and Royal remove speakers from the car's trunk. Fountain said he heard the car start and drive away. Fountain later saw a mop and bucket filled with what looked like blood in the room where Payton had been held. Fountain testified that he saw petitioner emptying this bucket the next morning.

¶ 9     Minnie Payton, Darren Payton's mother, testified that she received three phone calls from him in the early morning hours of April 24, 1993. Payton told Minnie to bring his car to the intersection of 71st Street and State Street and leave a package that was under the seat of the car on the passenger's side of the car. Minnie complied. While waiting at the intersection, a car pulled up, and Luckett and Mathews got out. They asked her if she was looking for Payton. Minnie got out of the car but left the package on the passenger side. Eventually, her husband picked her up and brought her home. When she arrived home, she received another call from Payton saying he would be home in five minutes.

¶ 10     Around 8 a.m. on April 24, 1993, Payton's body was found in the trunk of his car. Payton was blindfolded and had a cord wrapped around his neck. He had been strangled to death.

¶ 11    Chicago police officer Darren Washington testified that he received an anonymous call regarding Payton's death on April 27, 1993. The caller directed Washington to the house at 229 West 110th Place, where he arrested petitioner, Fountain, Luckett, Mathews, and Glover. Washington testified that, while he was at the house, Fountain asked to speak with him privately. Fountain told Washington that he knew why the police had come and that he was present "when they killed that boy." Fountain said he could not go to jail because he would be killed there.

¶ 12    After Fountain's arrest, Detective Michael McDermott interviewed him at the Area 2 police station. McDermott testified that Fountain said he saw Payton at the house with Adams and "several others." McDermott testified that Fountain declined to give a handwritten statement. He said that Fountain instead chose to give his statement before the grand jury. (For what it may be worth, Fountain later recanted his trial testimony.)

¶ 13    Bloodstains, a gun, and cords were found in the house. Beer bottles recovered at the scene contained fingerprints that positively matched the prints of Mathews, Royal, and Glover. Separate fires broke out at the house on May 11, 1993 and May 13, 1993, both of which were started by a hand-held open flame. The second fire caused significant damage to the building. Glover testified that Adams told him that he started the fires to destroy evidence in the house.

¶ 14    Records of the Grand Motel South, presented through the motel manager, Robert Tyson, showed that petitioner checked in at 6:14 a.m. on April 24, 1993, and checked out at 12:00 p.m. on that same day.

¶ 15    The trial court found petitioner guilty of murder and aggravated kidnapping, based on an accountability theory, and sentenced him to natural life in prison.

¶ 16   On his direct appeal, which was consolidated with codefendant Mathews, petitioner only challenged his sentence. We affirmed. *People v. Mathews and Scullark,* Nos. 1–95–3207 & 1–95–4010 (cons.) (1997) (unpublished order under Supreme Court Rule 23).

¶ 17   Petitioner filed his initial postconviction petition in 1999. We affirmed the second-stage dismissal of that petition. (But not before reversing two summary dismissals, both ordered by the same judge that denied leave to file here.) We found, in short, that an affidavit from Fountain, attesting that he was coerced into testifying falsely and didn't actually know who killed Payton, was insufficient to support a claim of actual innocence. See *Scullark,* No. 1–06–3267 (2009).

¶ 18   In 2010, petitioner sought leave to file a successive *pro se* petition, arguing that in his first proceeding, appointed counsel failed to support Fountain's claims of police coercion, at the hands of Detectives Boylan and McDermott, with the 2006 Report of the Special State's Attorney on torture at the Area 2 police station. The circuit court denied leave to file, finding that petitioner failed to satisfy the cause-and-prejudice test for a successive petition. We affirmed that ruling. *Scullark*, 2015 IL App (1st) 120962-U, ¶ 39.

¶ 19                                    II. Second successive petition

¶ 20   In May 2021, this time represented by private counsel, petitioner sought leave to file the second successive petition at issue here. Petitioner alleges two claims: his actual innocence and trial counsel's ineffectiveness.

¶ 21   Petitioner's actual-innocence claim is based in part on an affidavit from codefendant Mathews, who was also convicted on an accountability theory. In an affidavit dated January 10, 2020, Mathews acknowledged that he is "guilty" because he "participated in the kidnapping,"

and though he did not personally kill Payton, he did witness Payton's murder at the hands of codefendants Luckett and Royal during a party at his house. Petitioner, Mathews says, "was not involved with or present during the kidnapping or murder of Darren Payton." To be clear, "petitioner was not present at the house party" at all on the night that Payton was killed.

¶ 22   In somewhat more detail, Mathews gives the following account of the murder. Mathews lived in the building where Payton was killed; on the night of the murder, he threw a party that was attended by 30 or so people. Mathews did not know Payton at the time, but he saw him at the party, in the company of codefendants Luckett and Royal, and Paul Hawkins. Glover and Fountain were drinking and smoking; Glover, in particular, was "wasted" on crack.

¶ 23   The party was held on the first floor; the upstairs was under construction and generally off limits. But Luckett asked to use the upstairs space to "take care of some business." Luckett offered to pay, so Mathews agreed. At some point, Luckett asked Mathews to go get some money with him. They drove to a gas station, retrieved a bag of money from Mrs. Payton, and returned to the house to count it.

¶ 24   At that time, Payton was "tied up" on the upper floor of the house. Mathews "witnessed Luckett and Royal strangle Payton to death" and "carry Payton's body down the back stairs and put it in the trunk of a car." Again, according to the affidavit, petitioner "was not involved or present" at the house when all of this happened.

¶ 25   While Mathews was in custody, Detective McDermott told him that petitioner and codefendant Adams "were going to go down for this crime," because they recently had been acquitted on unrelated charges and McDermott thought they should have been convicted.

McDermott and Boylan pressured Mathews to "point the finger at Scullark and Adams and commit perjury." When Mathews refused to cooperate, McDermott punched him in the eye.

¶ 26    Mathews explained that he "did not come forward and admit [his] involvement earlier" because he thought, for a time, there was some chance that he "would get out on appeal."

¶ 27    Petitioner also includes an affidavit from Danelle Adams, an alibi witness known to the defense before trial. The affidavit is offered in support of the actual-innocence claim and, in the alternative, an ineffective-assistance claim alleging that trial counsel failed to interview Adams. In her affidavit, dated April 4, 2018, Adams attests that she was with petitioner from roughly noon on April 23, 1993 (the day of the murder) until roughly 1:00 p.m. the following day.

¶ 28    More specifically, she avers, petitioner picked Adams up from her grandmother's house around noon on the day of the murder. They drove to the home of her other grandmother to celebrate her 20th birthday with various family members named in the affidavit, all of whom unfortunately are now deceased. Petitioner and Adams spent the whole day together at her grandmother's house. They spent the night there, too, sleeping in the living room. They woke up around 5:00 a.m. the next morning and drove to the Grand Motel, making only one stop, at a gas station, along the way. They checked out of the motel around noon, and petitioner drove Adams back to her grandmother's house.

¶ 29    After petitioner was arrested, Adams called his trial attorney, Craig Katz, to discuss these events. In fact, she called twice. Both times, Katz told Adams that he needed to interview her and said that he would call her back to make arrangements. But Katz never contacted or interviewed Adams. And "no investigator or attorney ever contacted" Adams to discuss the events "until

2012 at the earliest," when petitioner "hired a private investigator *** as part of his post-conviction appeal efforts."

¶ 30    In his own affidavit, petitioner similarly attests that he was with Adams the whole time, first at her grandmother's house, and then at the Grand Motel. He further attests that he told all of this to attorney Katz after he was arrested. Katz told petitioner that he had spoken to Adams and would be contacting her soon, but "[o]n information and belief," Katz never did. Petitioner tried to find Adams himself after his trial (which Adams says she did not attend) but to no avail. He did not identify Adams in his previous filings because he had not yet located her and thus "did not know whether she would be willing to testify."

¶ 31    In denying leave to file, the circuit court found, among other things, that the affidavits were not "conclusive." In so finding, Judge Sacks explicitly and extensively "weighed" the affidavits against both the trial evidence and evidence submitted in other proceedings—either petitioner's own previous postconviction pleadings, or even those of his codefendants.

¶ 32                                  ANALYSIS

¶ 33                    I. Actual innocence based on the Mathews affidavit

¶ 34    Petitioner claims he should be granted leave to file his claim of actual innocence, based on the Mathews and/or Adams affidavits. The Adams affidavit is not newly discovered, for reasons we will explain, but even taking just the Mathews affidavit as true, petitioner has pleaded a colorable claim of actual innocence.

¶ 35    Leave to file a successive petition "should be denied only where it is clear from a review of the petition and supporting documentation that, as a matter of law, the petition cannot set forth

a colorable claim of actual innocence." *People v. Robinson*, 2020 IL 123849, ¶ 44. At the leave-to-file stage, "all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true." *Id.* ¶ 45. The court is "precluded" at this stage from making factual findings or determinations about the credibility or reliability of the supporting evidence. *Id.* ¶¶ 45, 61. Such findings "are to be made *only* at a third-stage evidentiary hearing in a successive postconviction proceeding." (Emphasis added.) *Id.* ¶ 61. We review the denial of leave to file *de novo*. *Id.* ¶ 40.

¶ 36      To establish a claim of actual innocence, the supporting evidence must be: (1) newly discovered; (2) material and not cumulative; and (3) of such conclusive character that it would probably change the result on retrial. *Id.* ¶ 47. There is no dispute on appeal that the Mathews affidavit is material and not cumulative. The State argues that it is neither newly discovered nor conclusive.

¶ 37      "Newly discovered evidence is evidence that was discovered after trial and that the petitioner could not have discovered earlier through the exercise of due diligence." *Id.* ¶ 47. The State concedes that the evidence in the Mathews affidavit was not available to petitioner before trial, and that the circuit court erred in ruling otherwise. We agree. Even when the defense knows of a witness before trial, that witness's later affidavit may still be newly discovered if the defense could not have compelled the witness to testify to the statements in his affidavit. *People v. Fields*, 2020 IL App (1st) 151735, ¶ 48; *People v. White*, 2014 IL App (1st) 13007, ¶ 20.

¶ 38      Here, Mathews was a codefendant, charged and convicted on a theory of accountability. Petitioner could not compel Mathews to put himself at the scene and thus exonerate petitioner at

the expense of implicating himself. *People v. Molstad*, 101 Ill. 2d 128, 135 (1984) ("no amount of diligence could have forced the codefendants to violate their fifth amendment right to avoid self-incrimination").

¶ 39    That fact alone renders the Mathews affidavit newly discovered. Petitioner need not demonstrate, as the State claims, that he diligently pursued an affidavit in his earlier postconviction proceedings; "he need only demonstrate that his failure to discover the evidence *prior to trial* was not due to a lack of diligence." (Emphasis added.) *People v. Smith*, 2015 IL App (1st) 140494, ¶ 19; see also *People v. Beard*, 2023 IL App (1st) 200106, ¶ 49 ("[w]e only consider whether the evidence was discoverable before trial" by diligent defense); *People v. Ayala*, 2022 IL App (1st) 192484, ¶ 134. Because "[s]tatements of a codefendant" are not "discoverable before trial," they "are considered newly discovered," full stop. *Beard*, 2023 IL App (1st) 200106, ¶¶ 49-50.

¶ 40    Our supreme court's decision in *People v. Edwards*, 2012 IL 111711, ¶¶ 1, 38, illustrates this point. The court held that a codefendant's self-incriminating affidavit was newly discovered, for purposes of a successive petition alleging actual innocence, without requiring the petitioner to detail any diligent efforts he may (or may not) have made to secure the affidavit in his earlier postconviction proceedings. It was enough to note that the codefendant could not be compelled to incriminate himself, and thus "[n]o amount of diligence could have forced him to violate that right if he did not choose to do so." *Id.* ¶ 38.

¶ 41    The State would have us view this case differently, perhaps as an exception to the general rule, because Mathews's conviction had already been affirmed on direct appeal when the initial

petition was filed. Thus, the State says, Mathews was "no longer at risk" of incriminating himself," and so petitioner had to commence a diligent effort to secure his affidavit.

¶ 42    This fact does not meaningfully distinguish petitioner's case from *Molestad*, as the State suggests. Or *Edwards*, for that matter. Nor does it make rational sense to impose this requirement on evidence like the Mathews affidavit, for at least two reasons.

¶ 43    For one, the State ignores a basic fact about the affidavit: it was the first time Mathews proved willing to incriminate himself by admitting that he was present for the murder. Until then, he had maintained that he was not. Not to belabor the obvious, but petitioner had no way to know that Mathews would one day change his story. Imposing a diligence requirement, in this context, would require petitioner to start pursuing evidence before it existed, and when petitioner had no particular reason to believe that it would ever exist. Put differently, it would require petitioner to proactively *ask* Mathews to recant his previous statements and abandon his own longstanding theory of defense, all for petitioner's benefit.

¶ 44    What's more, it is simply not true that Mathews was "no longer at risk" of incriminating himself once his direct appeal was resolved. Ironically enough, in a postconviction case, the State acts as if Mathews had no right to seek relief in a postconviction proceeding of his own. Not surprisingly, that is exactly what he did. We do not know when those proceedings came to an end, but it doesn't matter. For as long as Mathews remained in custody, asserting his innocence and believing that he had a potential avenue of relief on collateral review, he had every reason in the world to avoid incriminating himself. And petitioner could not compel him to do otherwise.

¶ 45    As Mathews himself puts the point in his affidavit, he "did not come forward and admit [his] involvement earlier" because he thought (or hoped, anyway) that there was some chance he "would get out on appeal." The State seizes on the word "appeal," but it seems obvious enough that Mathews uses it in a broad, non-technical sense, to encompass not only his direct appeal but also his post-conviction proceedings. (Note the phrase "post-conviction appeal efforts" in the Adams affidavit.)

¶ 46    For reasons like these, a petitioner is not required to diligently pursue a codefendant's affidavit, either before or after his direct appeal is resolved. The correct rule, simply stated, is this: a codefendant's affidavit is unavailable until he agrees to provide it, and so it is newly discovered when he does. Thus, the Mathews affidavit is newly discovered.

¶ 47    It is also conclusive. Taking the Mathews affidavit as true, "it is more likely than not that no reasonable juror would have convicted petitioner." *Robinson*, 2020 IL 123849, ¶ 61. Mathews attests that petitioner "was not involved with or present during the kidnapping or murder of Darren Payton," and indeed was "not present at the house party" at all on the night in question. Even on an accountability theory, the Mathews affidavit exonerates petitioner.

¶ 48    (We do not mean to imply that "total vindication or exoneration" is necessary; *Robinson* made clear that it is not. *Id.* ¶¶ 48, 55-56. Our point, rather, is that the Mathews affidavit, taken as true, easily clears the bar that *Robinson* established.)

¶ 49    In *Edwards*, 2012 IL 111711, ¶¶ 39-41, an affidavit stating that the petitioner "had nothing to do with this shooting" was not conclusive, because the petitioner was convicted on an accountability theory; thus, the affiant needed to attest that the petitioner was not *present* at all

when the shooting took place. Here, Mathews states exactly that.

¶ 50    To be sure, one can be accountable from a distance. But that was not the theory, or the evidence, presented at trial; petitioner was found accountable for conduct allegedly performed at the scene of the crimes. If he was not there at all, no rational juror could convict him.

¶ 51    Because the Mathews affidavit is exonerating on its face, there is only one way in which it might fall short of establishing petitioner's innocence: it might be deemed unworthy of belief. But that finding, if it proves warranted, can properly be made "*only* at a third-stage evidentiary hearing." (Emphasis added.) *Robinson*, 2020 IL 123849, ¶ 61.

¶ 52    Until then, the Mathews affidavit must be taken as the truth of the matter, since there was no objective, irrefutable evidence at trial to positively rebut it. (Recall that the only evidence was the testimony of Glover and Fountain.) And Mathews attests that petitioner was not present at all when other gang members killed Payton. So for purposes of the leave-to-file stage, petitioner was not present—and therefore not accountable. The Mathews affidavit is conclusive.

¶ 53    Parroting the circuit court's ruling below, the State argues that the Mathews affidavit is "rebutted by the record" because it conflicts with "his own prior sworn statements" and with other "affidavits which have sworn that Mathews was innocent and not present at the party."

¶ 54    We cannot reject that argument strongly enough. This is exactly the view that *Robinson* rejected as "fundamentally illogical" (*id*. ¶ 57): that new evidence of innocence is positively rebutted, and thus not conclusive, simply because it conflicts with other available evidence that tends to establish guilt. *Of course* the new evidence of innocence conflicts with the trial evidence of guilt; how could it not? If that were a deal-breaker, no actual-innocence petition would ever

succeed. That thinking would also effectively abolish the rule that the new evidence of innocence is *taken as true* at a pleading stage. A mere conflict between the new evidence of innocence and the trial evidence of guilt is not the standard; the new evidence of innocence must positively rebut the trial evidence in that "no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible." *Id.* ¶ 60.

¶ 55    This is a case in point: the State and the circuit court note that the Mathews affidavit conflicts with other evidence and go on to conclude, on this basis alone, that a jury would not believe the affidavit. That is *exactly* what *Robinson* rejected. If taking an affidavit as true means anything at all, it means we assume, at a pleading stage, that a jury would believe the affiant over other witnesses who told a conflicting story. Of course this assumption may unravel at an evidentiary hearing, when the credibility of the affidavit is put to the test. But until then, the assumption prevails.

¶ 56    The evidence that is said to conflict with the Mathews affidavit—and thus to show, in so many words, that the affidavit lacks credibility—comes from three sources: the trial testimony; affidavits that petitioner submitted with his *prior* postconviction pleadings; and an affidavit that Mathews submitted with *his own* petition, and which petitioner has never submitted or otherwise adopted in any proceeding of his own. The circuit court thus compounded the already serious and prejudicial error of making credibility judgments at a pleading stage by going outside the record in this case to do so. See *People v. Sanders*, 2016 IL 118123, ¶¶ 38-44 (error to consider credibility finding made at hearing in *codefendant's* case).

¶ 57    Taken as true, the Mathews affidavit is conclusive evidence of petitioner's innocence. On

this basis of this affidavit alone, petitioner thus states a colorable claim of actual innocence. We reverse the judgment denying him leave to file this claim.

¶ 58                                II. The Adams affidavit

¶ 59    Petitioner also bases his innocence claim, in part, on the Adams alibi affidavit. Taken as true, the Adams affidavit is no less exonerating than the Mathews affidavit, and in that sense it can surely be called evidence of innocence. But the Adams affidavit is not newly discovered, as is generally required for a claim of actual innocence.

¶ 60    Assuming (as we must at this stage) that the Adams affidavit speaks the truth, petitioner obviously knew that he was with Adams at the time of the murder. As did trial counsel, since Adams told him so. Trial counsel told Adams that he needed to interview her and said that he would call her back to make arrangements. But he never did. According to Adams, "no investigator or attorney ever contacted" her about this case until petitioner "hired a private investigator *** as part of his post-conviction appeal efforts." Petitioner's own affidavit similarly attests that counsel told him, before trial, that he spoke to Adams and would contact her soon; but ("[o]n information and belief") counsel never followed through.

¶ 61    Taken as true, the Adams affidavit thus demonstrates that a diligent attorney could have secured her testimony, and that trial counsel was not, in fact, diligent in this respect. So the Adams affidavit is not newly discovered. *Robinson*, 2020 IL 123849, ¶¶ 47, 53; *Edwards*, 2012 IL 111711, ¶ 38; *People v. Harris*, 206 Ill. 2d 293, 301 (2002).

¶ 62    The flip side of this coin is that trial counsel was deficient for failing to interview a known alibi witness. *People v. Henry*, 2016 IL App (1st) 150640, ¶¶ 56-57; *People v. Bolden*,

- 15 -

2014 IL App (1st) 123527, ¶¶ 30, 45-46; *People v. Tate*, 305 Ill. App. 3d 607, 612 (1999); see

*Strickland v. Washington*, 466 U.S. 668, 691 (1984) (counsel "has a duty to make reasonable

investigations or reasonable decisions that make particular investigations unnecessary"). And in

the alternative to his actual-innocence claim, petitioner does allege that trial counsel was

ineffective for this reason.

¶ 63    The distinction between evidence that a diligent defense could not have obtained, on the

one hand, and available evidence that a *non*-diligent defense failed to obtain, on the other, marks

the basic fault line between actual-innocence and ineffective-assistance claims. And there is no

question on which side of the line the Adams affidavit falls: the allegations, taken as true,

establish that trial counsel was deficient in failing to diligently investigate an available alibi

witness.

¶ 64    Petitioner would have us consider the Adams affidavit in support of both his claims. He

argues that when counsel fails to investigate or present an available witness, that deficiency in

counsel's performance renders the witness *un*available to the defendant, such that a later-

obtained affidavit will be deemed newly discovered. In this way, an affidavit that on its face

supports a claim on ineffective assistance can also be used as evidence of actual innocence.

¶ 65    If counsel's deficiency is precisely what renders the evidence newly discovered, then

there is no distinction at all between the two types of claims. As a general proposition, this is

plainly not an accurate statement of Illinois law. So petitioner's argument is at best overbroad. A

close look at the "well-established precedent" he cites confirms that there is no such general rule,

though there are rare, unusual scenarios in which we will relax the strict definition of "newly

discovered evidence" to avoid an obvious injustice. This case, as we will see, is not one of them.

¶ 66    First up is *People v. Triplett*, 2021 IL App (1st) 180546-U, a non-precedential decision that illustrates our point exactly. As here, the petition in *Triplett* alleged claims of ineffective assistance and actual innocence. The ineffectiveness claim was based on trial counsel's failure to interview a known alibi witness and was supported by an affidavit from that witness. *Id.* ¶¶ 3, 37. The actual-innocence claim was based on a new affidavit from Robinson, attesting that Johnson, a key witness who identified the petitioner at trial, was with him, elsewhere, at the time of the shooting, and therefore could not have witnessed it. *Id.* ¶¶ 3, 46. There was no claim, and no finding by the court, that the alibi affidavit was *also* evidence of actual innocence, on the ground that counsel's deficient performance rendered the alibi witness unavailable at trial. In suggesting otherwise, petitioner misdescribes the case.

¶ 67    In *Ayala*, 2022 IL App (1st) 192484, two codefendant-petitioners, Ayala and Soto, were jointly tried and convicted of murder and other offenses—Soto as the shooter, Ayala on a theory of accountability. *Id.* ¶ 2. They alleged their actual innocence in their respective petitions based on affidavits from Abarca and Mullins, who identified Rodriguez as the real shooter. *Id.* ¶¶ 66-68, 81. In an unusual twist, it turned out that DeLeon, one of two attorneys who jointly represented both petitioners at trial, *also* represented Rodriguez, who had been separately charged (in juvenile court) as the shooter. *Id.* ¶¶ 2, 5, 51, 129.

¶ 68    Given these highly unusual facts, the Abarca and Mullins affidavits technically failed to qualify as newly discovered evidence, because the witnesses were in some sense known to the defense before trial. *Id.* ¶ 141. At least attorney DeLeon would have known of them. Even so, we

deemed the affidavits newly discovered, and considered them in support of the actual-innocence claims, because the witnesses were "available" at trial in what we might call an overly technical sense: they were known to a conflicted attorney who allegedly failed to call them because they would implicate his other client. *Id.* And the petitioners, we reasoned, had no way to force their attorney to violate his duty of loyalty to Rodriguez, though we note that it is unclear whether the petitioners themselves even knew of the witnesses before trial. *Id.*

¶ 69    The actual-innocence framework is meant to ensure that technical defaults do not work a "fundamental miscarriage of justice" against a petitioner with an otherwise legally viable claim of innocence. *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002). In so many words, *Ayala* thus relaxed the strict definition of "newly discovered evidence" to avoid what we perceived as an injustice arising from a unique set of circumstances.

¶ 70    But we never intended this exception to apply to an alibi obviously known to the *petitioner himself* before trial. *Ayala* itself makes this plain. Among the affidavits submitted was one from Mora, an alibi witness who claimed she was with the petitioners, at Ayala's home, when the shooting took place. *Ayala*, 2022 IL App (1st) 192484, ¶ 79. The Mora affidavit was not newly discovered, and so did not support the petitioners' actual-innocence claims, for the simple reason that the alibi was obviously known to the defense before trial. *Id.* ¶ 142. Given these garden-variety facts—like ours here—the usual rule applied.

¶ 71    In *People v. Warren*, 2016 IL App (1st) 090884-C, the petitioner, represented by counsel, alleged his actual innocence in his initial petition. *Id.* ¶ 3. Multiple witnesses provided affidavits in support of this claim; when the time came to file, all that remained was for counsel to get their

signatures and attach their affidavits to the petition—which he failed to do. *Id.* ¶¶ 3, 26, 38. The limitations period was about to run out, as counsel explained, and he apparently couldn't get his act together, so he filed the petition without the affidavits or any explanation of why they might be considered unavailable. *Id.* The petition was dismissed, in part, for a lack of evidentiary support. *Id.* ¶ 3.

¶ 72    These facts are a dead ringer for ineffective assistance, and that would undoubtedly be the appropriate claim if an attorney failed to make use of available evidence *at trial* because he ran out of time to perform some foundational tasks. But there's a wrinkle: *Warren* involved an initial petition, not a trial, and, critically, there is no such claim as ineffective assistance of post-conviction counsel. *Id.* ¶ 128. So there was only one way to provide meaningful relief: allow the petitioner to raise his innocence claim in a successive petition, with the supporting affidavits attached, and free of any procedural bars. *Id.* ¶ 130.

¶ 73    There was an argument to be made that the affidavits were not new. *Id.* ¶¶ 115, 130. But we did not insist on technicalities at the expense of fundamental fairness. *Id.* ¶ 130. A petitioner should not be barred from presenting his evidence of innocence, leaving him with *no* avenue for relief at all, just because his lawyer couldn't pull a submission together in time. *Id.* On "facts as unique as these," an attorney's incompetence should "excuse the failure to present new evidence [of innocence] in an earlier petition." *Id.* ¶ 132.

¶ 74    There are no unique or extraordinary circumstances in this case that compel us to relax the usual definition of "newly discovered evidence" to preserve the ultimately equitable nature of the actual-innocence framework. Petitioner's claim is a garden-variety example of ineffective

assistance of trial counsel. The Adams affidavit is indistinguishable from the alibi affidavits in *Triplett* and *Ayala*. Unlike the petitioner in *Warren*, petitioner here did not assert his claim, or for that matter, acquire the evidence in question (minus the signatures) for his initial petition. And unlike the petitioner in *Warren*, the usual *Strickland* remedy is available to him.

¶ 75    The problem for petitioner is that it has taken him the better part of 30 years to so much as mention an alibi witness who was known to him before trial. His first and best opportunity to pursue a remedy was immediately after his trial, at a *Krankel* proceeding—a forum literally made for claims like his. See *People v. Krankel*, 102 Ill. 2d 181, 184 (1984) (post-trial allegation giving rise to *Krankel* rule was that "counsel failed to investigate an alibi witness"). He could have alleged his claim in his initial petition, and if, as he now asserts, an affidavit from Adams could not be obtained at that time, through no fault of his own, he could have explained why. (More on this topic shortly.) Instead, petitioner said nothing at all about his known alibi until his successive petition. The usual rules for newly discovered evidence apply in this context. Which means that his claim is one of ineffective assistance—and it is a defaulted claim at that.

¶ 76    So petitioner must obtain leave to file. To this end, he must demonstrate that there was "cause for his or her failure to bring the claim in his or her initial post-conviction proceedings," and that "prejudice results from that failure." 725 ILCS 5/122-1(f) (West 2012); see *People v. Pitsonbarger*, 205 Ill. 2d 444, 462 (2002) (cause and prejudice test must be applied to each individual claim in successive petition, other than actual innocence).

¶ 77    "Cause," the basis for our ruling here, means "an objective factor that impeded his or her ability to raise a specific claim during his or her initial postconviction proceedings." 725 ILCS

5/122-1(f) (West 2022). An "objective" impediment is one that is "external to the defense," on account of which the legal or factual basis for the claim "was not reasonably available" in earlier proceedings. *People v. Blalock*, 2022 IL 126682, ¶ 39; *People v. Pitsonbarger*, 205 Ill. 2d 444, 462 (2002). The cause determination is made on the pleadings, taking the allegations and supporting affidavits as true, and is subject to *de novo* review. *People v. Smith*, 2014 IL 115946, ¶¶ 33-35; *People v. Bailey*, 2017 IL 121450, ¶ 13. We note, in passing, that the circuit court entirely failed to address the cause-and-prejudice test.

¶ 78    Petitioner alleges in his own affidavit that after his trial, he "tried to find Ms. Adams" but "could not locate her." Without her affidavit in hand, he "did not know whether she would be willing to testify." Thus, he did not "specifically identify" Adams in his initial petition, despite alleging that trial counsel was ineffective for failing to investigate other witnesses. Since Adams "had not yet come forward," and because he "could not locate her" on his own, petitioner alleges that Adams's testimony "was previously unavailable" to him.

¶ 79    These allegations are too little, too late, to adequately plead cause for petitioner's failure to raise his claim in his initial petition. In *People v. Coleman*, 2023 IL App (1st) 210263, the petitioner alleged, in a successive pleading, that his trial counsel was ineffective for failing to present an exculpatory witness known to the defense before trial. *Id.* ¶¶ 11, 21. He further alleged "that he was unable to obtain [the witness's] affidavit" until after he had filed his initial petition and "therefore was incapable of supporting his ineffective assistance claim, as required," in that pleading. *Id.* ¶ 22. Much like petitioner alleges here.

¶ 80    We held that these allegations were insufficient to plead cause. Because the petitioner

was aware of the facts that the witness was to provide in an affidavit, he could have alleged these facts in support of his claim and attached "his own affidavit *** explaining why [the witness] could not be located." *Id.* ¶ 23. This would have stated the gist of a claim, at the first stage of an initial petition, and satisfied the statutory requirement that a "petition shall have attached thereto affidavits, records, or other evidence supporting its allegations *or shall state why the same are not attached*." (Emphasis added.) 725 ILCS 5/122-2 (West 2022); see *People v. Collins*, 202 Ill. 2d 59, 67 (2002). A failure to take these steps in the initial petition results in a procedural default of the claim without good cause shown.

¶ 81   *Coleman* thus holds that where a petitioner alleges that trial counsel failed to present a known witness but does not have an affidavit from the witness in hand, he must still allege the claim in his initial petition, document his diligent efforts to locate the witness, and thus explain why the lack of a supporting affidavit is not his fault. And note that a petitioner's incarceration, while no doubt a significant practical obstacle to finding a witness, has never been recognized as a sufficient reason to excuse the absence of a supporting affidavit.

¶ 82   One might object that the Adams affidavit should not be subject to stricter requirements than the Mathews affidavit. But fundamental differences between the witnesses justify different treatment. Mathews was a codefendant who one day proved willing to incriminate himself; no amount of diligence by petitioner could have brought that about. Adams was a known alibi who was evidently willing to speak up on petitioner's behalf and who was never in any danger of self-incrimination. Petitioner did not need her to change her story, abandon her own defense, or waive her privilege. Petitioner simply needed to find her. Granted, that is not always easy from

prison. But it was his burden.

¶ 83    As in *Coleman*, the factual basis for petitioner's claim was obviously known to him when he filed his initial petition: he knew he was with Adams at the time of the murder; he knew that Adams told trial counsel; and he knew that trial counsel failed to interview her. Petitioner thus knew what his alibi was, who his alibi witness was, and how trial counsel knew of the witness but failed to conduct a reasonable investigation into this defense. Even without an affidavit from Adams to support his claim, petitioner could have alleged the facts on which his claim was based and attached his own affidavit explaining what steps he took to locate Adams and why his diligent efforts failed through no fault of his own. (If, indeed, that was the case.)

¶ 84    A petition alleging these facts, and supported by petitioner's affidavit, as thus described, would have stated the gist of a claim and should have advanced to the second stage. And we note that his initial petition advanced to the second stage, anyway. Either way, petitioner would have had the assistance of post-conviction counsel in his efforts to find Adams—but only if he alleged his claim at that time.

¶ 85    Of course, there's no guarantee that post-conviction counsel would have found Adams. But even if Adams proved elusive, and a lack of diligence wasn't the problem, petitioner could have established that her affidavit was not "reasonably available" when he asserted his claim in his initial petition. *Blalock*, 2022 IL 126682, ¶ 39. And if the affidavit later became available, he could then reassert his claim and support it with his new evidence. See *People v. Brandon*, 2021 IL App (1st) 172411, ¶ 42; *People v. Wrice*, 406 Ill. App. 3d 43, 52 (2010), *aff'd*, 2012 IL 111860, ¶ 85.

¶ 86    Having done none of this, petitioner procedurally defaulted his claim. His bare allegation that he could not locate Adams, until one day he did, is not good cause shown. For this reason, we affirm the denial of leave to file his ineffective-assistance claim and respectfully reject his contention that the Adams affidavit is newly discovered evidence of actual innocence.

¶ 87                                III. Reassignment to new judge

¶ 88    Petitioner argues that the case should be assigned to a different judge on remand, because the circuit judge improperly prejudged the credibility of his allegations and supporting evidence at the leave-to-file stage.

¶ 89    We recognize that the decision to reassign a case to a new judge is not to be made lightly, and certainly not on the basis of adverse rulings or ordinary judicial error alone. *People v. Vance*, 76 Ill. 2d 171, 181 (1993); *Eychaner v. Gross*, 202 Ill. 2d 228, 280 (2002). Rather, the question is whether "fair judgment" will be possible in the proceedings to follow on remand. *Eychaner*, 202 Ill. 2d at 281. We agree with petitioner that the answer here is no.

¶ 90    The circuit judge's ruling—this time at the leave-to-file stage—was replete with premature credibility findings. These findings were all couched in the language of "conclusive" evidence, but we agree with petitioner that the judge determined whether evidence was conclusive by asking whether it deserved to be believed, when it was "weighed against" the other available evidence from trial, petitioner's prior filings, and even Mathews's own post-conviction petition. These are nothing but credibility judgments.

¶ 91    For example, the judge found that the Mathews affidavit was not conclusive "when weighed against the unimpeached and consistent testimony of the trial witnesses." In other

words, the trial witnesses were credible and thus Mathews was not.

¶ 92    The court found that the Mathews affidavit was "inherently unreliable," and thus not conclusive, because it conflicts with prior statements Mathews made in support of his own post-conviction petition. In short, Mathews was not a consistent—and thus not a credible—witness. The fact that the judge, as we noted above, would go outside the record in this case to find reasons to reject the Mathews affidavit only adds to our skepticism that he has approached petitioner's allegations and supporting evidence with an open mind.

¶ 93    The court similarly rejected the Mathews affidavit as less than conclusive because it conflicted with statements made by other witnesses in support of petitioner's earlier filings. The same points that we just made apply here, too.

¶ 94    Those points also apply in spades to the Adams affidavit. Judge Sacks "did not find this alibi compelling and found both Glover and Fountain credible." And the alibi affidavit was not conclusive given Adams's longstanding "silence" on this issue. That, too, equates conclusiveness with credibility. We recognize that the Adams affidavit will no longer be at issue, in light of our ruling, but the judge's reasons for rejecting it nonetheless bear emphasis, as they underscore the extent to which the judge has prematurely decided that petitioner's claims should fail because they are not worthy of belief.

¶ 95    We are not at all confident that any judge could preside over an evidentiary hearing with an open and impartial mind after prematurely deciding *every* question of fact and credibility that was supposed to be reserved for the hearing. These judgments will inevitably color the court's perception of the evidence; it is unrealistic, at best, to assume otherwise. This alone renders "fair

judgment *** impossible" in the proceedings to come. *Eychaner*, 202 Ill. 2d at 281.

¶ 96    Petitioner points to other remarks as evidence that the judge had already made up his mind about the outcome of the case long ago, from the earliest status hearings. But we have said enough; the fact that the trial judge has already passed judgment on every key factual question that must eventually be decided at a hearing is reason enough to reassign the case.

¶ 97    Illinois Supreme Court Rule 365(a)(5) (eff. Feb. 1, 1994) permits a reviewing court, in its discretion, to make any order or grant any relief that a particular case may require. "This authority includes the power to reassign a matter to a new judge on remand." *Eychaner*, 202 Ill. 2d at 279. Out of an abundance of caution, and to preserve petitioner's right to a fair hearing, we exercise that authority here.

¶ 98                                CONCLUSION

¶ 99    The judgment of the circuit court is affirmed in part and reversed in part. The case is remanded for second-stage proceedings on petitioner's actual-innocence claim. On remand, the case shall be reassigned to a different judge of the circuit court.

¶ 100   Affirmed in part; reversed in part; remanded with instructions.